

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00037-CV

_____

MICHAEL D. LEE, Appellant

V.

THE ROGERS AGENCY, C. MICHAEL ROGERS,
AND NEW YORK LIFE INSURANCE COMPANY, Appellees

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 2014-615-B

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

OPINION

Michael D. Lee (Lee) brought this cause of action against New York Life Insurance Company, The Rogers Agency, and C. Michael Rogers[1] seeking declaratory relief and damages stemming from alleged negligence, violations of Texas' Deceptive Trade Practices Act, violations of the Texas Insurance Code, declaratory relief, and breach of contract. The 124th Judicial District Court of Gregg County, entered summary judgment in favor of New York Life, and Lee appealed. For the reasons below, we affirm part of the trial court's judgment and reverse the remainder of that judgment.

I.      Background Facts

        A.      The Life Insurance Policies and the Irrevocable Insurance Trust

        Between 1985 and 1987, Lee purchased three whole-life insurance policies from New York Life Insurance Company with the assistance of Rogers, an insurance agent for New York Life Insurance Company. Each of the three policies had a face value of $1,000,000.00 (the Policies). The Policies provided that Lee could shorten the premium payment period by tendering payment in full. Lee maintains that, in 1989, pursuant to Rogers' representations, he paid New York Life Insurance Company $238,188.15, which he understood would extinguish his obligation to pay premiums on the Policies.[2] On June 10, 1991, Lee transferred ownership of the Policies to the

_____

[1]When discussing the appellees collectively, we will refer to them as 'the Appellees."

[2]Paragraph 4 of the Policy contains a sub-paragraph, entitled "Fully Paid-up Policy," which states,

> You may shorten the premium paying period for this policy by having it made fully paid-up with no more premiums due. This may be done on any due date, if the sum of the cash value and dividend values equals the total single premium for the policy and any riders, based on the Insured's age on that date. We must receive your signed notice within 31 days of that date.

Michael D. Lee Irrevocable Insurance Trust (the Trust). Pursuant to the transfer, the owner of the Policies became Richard A. Dial (Dial), who was the trustee of the Trust.

### B. The *Willson* Class-Action Litigation

Approximately three years after Lee transferred ownership of the Policies to the Trust, a consolidated class-action suit was filed in New York State court. *See Willson v. New York Life Ins. Co., et al.*, 228 A.D.2d 368 (Sup. Ct. N.Y. 1996). In their class-action complaint, the *Willson* plaintiffs maintained that they were fraudulently induced and deceived into purchasing insurance policies from New York Life Insurance Company that were based on false and misleading sales presentations, policy illustrations, and marketing materials. The *Willson* plaintiffs claimed that the company and its agents misrepresented to them that "the single prepayment of premiums made by members of the [c]lass at the time of purchase, or a fixed number of premiums paid during a fixed period of years, would be sufficient to carry the cost of the Policies for the life of the insured. . . ." As a result, the class alleged claims for breach of contract, fraud, negligent misrepresentation, deceptive trade practices, and unjust enrichment. The *Willson* class included persons or entities who had, at the time of the Policy's termination or as of the date of settlement, an ownership interest in a policy issued by New York Life between January 1, 1982, and December 31, 1994.

In July 1995, the parties agreed to a settlement, in which New York Life would pay the *Willson* plaintiffs $2 billion. The trial court entered an order confirming certification of the class for settlement purposes, directing issuance of class notice, and setting forth procedures for opting

---

Although "[a]n allegation of mere breach of contract, without more, does not constitute a 'false, misleading, or deceptive act' in violation of the DTPA," the misrepresentation alleged by Lee is not that the policies allowed him to pre-pay the premiums, but that $238,188.15 was sufficient to do so. *Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996).

3

out of the class. Pursuant to the court's order, the parties mailed the court-approved notice to three million class members at their last known addresses. New York Life claims the class notice was mailed to Dial, as the Trustee of the Lee Trust, and was not returned. Dial did not request exclusion before the deadline of October 31, 1995, nor was he included in the court-approved list of individuals who asked to be excluded from the *Willson* suit.

On February 1, 1996, the New York court entered findings of fact and conclusions of law and dismissed with prejudice the *Willson* class-action litigation.

### C. Lee Files Suit Against the Appellees

In April 2012, two of Lee's Policies lapsed for non-payment of the premiums, with the remaining cash value used to purchase extended term insurance that subsequently expired. The third Policy eventually expired as well. In May 2012, New York Life notified Lee that his Policies had lapsed due to unpaid premiums. In March 2014, Lee filed the present suit against the Appellees for negligence, declaratory relief, breach of contract, violations of the Texas Insurance Code, and violations of Texas' Deceptive Trade Practices Act (DTPA).

In Lee's second amended petition, he alleged that Rogers, as an agent of New York Life, falsely represented that, in the event he paid an additional $238,188.15 in premiums, the Policies would be paid in full and would remain in effect for his lifetime. The Appellees denied the allegations and removed the case to federal court. Pursuant to Lee's motion, the federal court remanded the case back to state court. Following the remand, the Appellees filed motions for summary judgment arguing that, when Lee transferred the Policies to the Trust, he expressly waived or assigned his rights under the Policies, including his right to pursue any claims against

4

the Appellees. Based on this contention, New York Life argued that Lee had no standing to litigate his claims or, in the alternative, that his claims were barred by res judicata because they had been fully litigated in the *Willson* class action. The trial court granted the Appelleess' motions for summary judgment. This appeal followed.

## II.    Standard of Review

To be entitled to traditional summary judgment, a movant must establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Once the movant produces evidence entitling it to summary judgment, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

A trial court's entry of summary judgment is subject to de novo review by an appellate court. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In performing the required review, we deem as true all evidence which is favorable to the non-movant, indulge every reasonable inference to be drawn from the evidence, and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). "When the trial court does not specify the basis for its ruling, as is the case here, a summary judgment must be affirmed if any of the grounds on which judgment is sought are meritorious." *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

### III.  Does Lee Have Standing to Raise the Contractual and Extra-Contractual Claims at Issue?

#### A.  Introduction and Standard of Review

The Appellees argue that Lee has no standing to pursue any claims in this case because, upon transferring the Policies to the Trust, he either assigned or relinquished all claims he had or may have had related to the Policies.  Lee concedes that he lacks standing to pursue any claims based on duties created by the Policies (contractual claims), but he asserts that he still has standing to assert claims for the breach of duties arising under state law rather than under the Policies (extra-contractual claims).  Specifically, Lee contends that his extra-contractual DTPA and Insurance Code claims remained viable after the Policies were transferred to the Trust because he seeks redress for misrepresentations made to him as an individual consumer and not as owner of the Policies.  Therefore, Lee maintains he has standing to proceed with this case.

Standing is a fundamental element of a court's subject-matter jurisdiction.  *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444–45 (Tex. 1993).  In Texas, the standing doctrine demands (1) that there be a "real controversy between the parties" and (2) that the controversy "will be actually determined by the judicial declaration sought."  *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996) (quoting *Tex. Air Control Bd.*, 852 S.W.2d at 446) (internal quotation marks omitted).  "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome. . . ." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005).  A plaintiff must affirmatively show, through pleadings and other evidence pertinent to the jurisdictional inquiry, a distinct interest in the asserted conflict, such that the defendant's actions have caused the plaintiff

some particular injury. *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984); *see Cty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). Whether a plaintiff has standing is a legal question we review de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). Because the Appellees base their standing argument on Lee's transfer of the policies under the Trust Agreement, resolution of this issue requires us to interpret that Trust Agreement.

### B.      Canons of Trust Interpretation

The meaning of a trust instrument is a question of law when there is no ambiguity as to its terms. *Nowlin v. Frost Nat'l Bank*, 908 S.W.2d 283, 286 (Tex. App.—Houston [1st Dist.] 1995, no writ). If the court is capable of giving a definite legal meaning or interpretation to an instrument's words, it is unambiguous, and the court may construe the instrument as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Only when the trust instrument's language is uncertain or reasonably susceptible to more than one meaning will it be considered ambiguous so that its interpretation presents a fact issue precluding summary judgment. *Id.* at 394.

The overriding principle to be observed in construing a trust instrument is to ascertain the settlor's intent with the view of effectuating it. *Parrish v. Mills*, 106 S.W. 802 (Tex. 1908). "[I]t is the intention of the settlor at the time of the creation of the trust that is determinative." *Coffee v. William Marsh Rice Univ.*, 408 S.W.2d 269, 273 (Tex. App.—Houston [1st Dist.] 1966, writ ref'd n.r.e.) (quoting RESTATEMENT OF TRUSTS § 4 (Am. Law. Inst.)). We interpret trust instruments the same way as we interpret wills, contracts, and other legal documents. *Lesikar v. Moon*, 237 S.W.3d 361, 366 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Thus, when interpreting a trust, a court must

7

(1) [c]onstrue the agreement as a whole; (2) give each word and phrase its plain, grammatical meaning unless it definitely appears that such meaning would defeat the parties' intent; (3) construe the agreement, if possible, so as to give each provision meaning and purpose so that no provision is rendered meaningless or moot; (4) express terms are favored over implied terms or subsequent conduct; and (5) surrounding circumstances may be considered—not to determine a party's subjective intent—but to determine the appropriate meaning to ascribe to the language chosen by the parties.

*McCarty v. Montgomery*, 290 S.W.3d 525, 532 (Tex. App.—Eastland 2009, pet. denied).

Moreover, when determining the parties' intent, the court must be particularly wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). For this reason,

we "examine and consider *the entire writing* in an effort to harmonize and give effect *to all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."

*Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (quoting *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).

C. The Lee Irrevocable Life Insurance Trust Agreement

1. The Assignment and Relinquishment Provisions

The Appellees point to various provisions of the Trust Agreement in support of their argument that all of Lee's extra-contractual claims were either assigned to the Trustee or relinquished by Lee. In paragraph 3, the Trust Agreement states, "The Settlor hereby relinquishes all rights and powers in such policies of insurance which are not assignable, and will, at the request

8

of the Trustee, execute all other instruments reasonably required to effectuate this relinquishment."

In paragraph 9, the Trust Agreement states,

> In addition to the powers conferred by the common law, by the Texas Trust Act, or by other provisions hereof, the Trustee is hereby empowered: . . . (p) to do all such acts, take all such proceedings, and to exercise all rights and privileges, although not hereinbefore specifically mentioned, with relation to any such property, as if the absolute owners thereof, and, in connection therewith, to make, execute, and deliver any instruments, and to enter into any covenants or agreements binding any trust created thereunder.

Finally, paragraph 17 of the Trust Agreement provides,

> This Trust shall be irrevocable, and the Settlor hereby expressly waives all rights and powers, whether alone or in conjunction with others, and regardless of when or from what source the Settlor may heretofore or hereafter have acquired such rights or powers, to alter, amend, revoke, or terminate the Trust, or any of the terms of this agreement, in whole or in part. To more fully express his intention, the Settlor hereby declares that, by this instrument, the Settlor relinquishes absolutely and forever all his possession or enjoyment of, or right to, the income from the Trust property, and all his rights and powers, whether alone or in conjunction with others, to designate the persons who shall possess or enjoy the Trust property, or the income therefrom.

Consequently, the first question before us is whether Lee's causes of action in this case are among those "rights and powers in such policies" that Lee assigned or relinquished when the policies were transferred to the Trust.[3]

---

[3]The Texas Supreme Court has held that DTPA claims are not assignable. *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners, Ltd*., 146 S.W.3d 79, 89 (Tex. 2004). Although the Supreme Court has not addressed whether Insurance Code claims are assignable, three federal district courts applying Texas law have ruled that they are not for the same reasons discussed in *PPG Industries, Inc.*, and we agree with the reasoning in those cases. *See Great Am. Ins. Co. v. Fed. Ins. Co*., Civ. No. 3:04-CV-2267-H, 2006 WL 2263312, at *10 (N.D. Tex. 2006) (holding "[E]ach and every policy argument articulated by the Texas Supreme Court [in *PPG Industries, Inc*.] against assignment of a DTPA claim applies with equal force to a claim brought under the Texas Insurance Code."); *Launius v. Allstate Ins. Co*., Civ. No. 3:06-CV-0579-B, 2007 WL 1135347, at *6 (N.D. Tex. 2007) (holding that, because "the test most commonly used to determine survivability is whether or not the cause of action may be assigned" and because *Great American Insurance Co. v. Federal Insurance Co*. noted the similarity between DTPA claims and Insurance Code claims, insured's Insurance Code claims did not survive his death (quoting *Lindsay ex rel. Lindsay v. S. San Antonio Indep. Sch. Dist.*, 983 S.W.2d 778, 779 (Tex. App.—San Antonio 1998, no pet.) (internal quotation marks omitted)); *Am. S.*

First, we look to the language used in the Trust Agreement.  While the language of each grant and relinquishment provision is extremely broad, each is also limited by other Trust Agreement language.  Paragraph 3's broad grant and relinquishment clause is limited to "rights and powers *in such policies of insurance*" and must be read together with the first sentence of that paragraph, which states, "The Trustee is hereby vested with all right, title, and interest in and to such policies of insurance, and the Trustee is authorized and empowered to exercise and enjoy, *for the purposes of the Trust herein created*." (Emphasis added).  Similarly, paragraph 9(p)'s enumerated powers must be read in connection with paragraph 9(a)'s limitation, which states that the "Trustee hold[s], possess[es], manage[s] and control[s] the Trust Estate *for the purposes and uses herein set forth*." (Emphasis added).  Finally, paragraph 17's waiver is expressly defined as a waiver of "all rights and powers . . . *to alter*, *amend*, *revoke*, *or terminate the Trust*, *or . . . any of the terms of this agreement*, in whole or in part." (Emphasis added).[4]

---

*Ins. Co. v. Buckley*, 748 F.Supp.2d 610, 626 (E.D. Tex. 2010) (quoting *Great American Insurance Co. v. Federal Insurance Co.*, court held that "statutory remedies under the Texas Insurance Code are personal and punitive in nature and the Insurance Code makes no provision for assignability" (internal quotation marks omitted)); *but see*, *Berkley Reg'l Ins. Co. v. Philadelphia Indem. Ins. Co.*, No. A-10-CA-362-SS, 2011 WL 9879170, at *8 (W.D. Tex. 2011) (holding that "claims under Texas Insurance-Code Chapter 541 may not be assigned, but [claims] under Chapter 542 may be").  Nevertheless, no case has held that DTPA or Insurance Code claims cannot be relinquished, and if Lee relinquished his extra-contractual claims, he would lack standing regardless of whether he assigned those claims to the Trustee.  Therefore, even though Lee could not have assigned his DTPA and Insurance `Code claims, he could have relinquished them.  For this reason, we must decide whether the relinquishment language in the Trust Agreement deprives Lee of standing to assert his extra-contractual claims.

[4]Although the Appellees asserts Paragraph 17's waiver in support of their standing argument, that paragraph is not applicable because it is specifically limited to the rights "*to alter, amend, revoke, or terminate the Trust, or . . . any of the terms of this agreement*," to Lee's "possession or enjoyment *of, or right to, the income* from the Trust property," and to Lee's powers "*to designate* the persons who shall possess or enjoy the Trust property, *or the income* therefrom." (Emphasis added).  The waivers in that paragraph do not address the right to assert extra-contractual causes of action.  Yet, as will be shown later in this opinion, the paragraph is significant in that it confirms Lee's intent in creating the Trust Agreement.

10

## 2.     The Trust's Purpose

Consequently, the Trust's broad waivers and relinquishments of rights by Lee and the broad grants of rights and powers to the Trustee must be read in context with the concomitant limitations on those waivers, relinquishments, and grants, which are also stated in the Trust Agreement.  Moreover, we must consider the circumstances surrounding the Trust's creation, "not to determine [Lee's] subjective intent[,] but to determine the appropriate meaning to ascribe to the language chosen by [him]." *McCarty v. Montgomery*, 290 S.W.3d at 532; *Lone Star Gas Co. v. Mexia Oil & Gas Co.*, 833 S.W.2d 199, 202 (Tex. App.—Dallas 1992, no pet.).   Because paragraphs 3 and 9 are both limited to "the purposes of" the Trust Agreement, we must look to the circumstances surrounding the Trust's creation "to determine the appropriate meaning to ascribe to the language ['the purposes of the trust']." *Id.*

In its brief on appeal, New York Life acknowledges that,

> Through the Trust Agreement, Lee established an irrevocable life insurance trust, which "provides a potential means of avoiding estate taxes by transferring ownership of a life insurance policy to the trust so the policy proceeds are not included in the decedent's estate." *See Randall v. Goodall & Davison, P.C.*, No. 03-12-00005-CV, 2013 WL 3481518, at *1 (Tex. App.--Austin, July 2, 2013, pet. denied).  In order to avoid the inclusion of the Policies' proceeds in his gross estate, Lee had to ensure that he did not possess "at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person," of the Policies.  26 U.S.C. § 2042; *see also Estate of Leder v. C.I.R.*, 893 F.2d 237, 242–43 (10th Cir. 1989) (concluding that an insured who "never held any ownership, economic, or other contractual rights in the policy" did not have any "incidents of ownership" under Section 2042).[5]

---

[5]Rogers makes the same argument in his brief.

11

Thus, the Appellees initially acknowledge that the Trust's purpose was to shield the Policies from estate taxes at Lee's death, and to do that, Lee had to divest himself of all "incidents of ownership" in the Policies. However, it then defines the phrase "incidents of ownership" broadly in the same way a court would interpret release language in a compromise settlement agreement. Nevertheless, a review of the federal cases interpreting 26 U.S.C. § 2042's "incidents of ownership" language demonstrates that the statutory definition cannot be read as broadly as the Appellees suggest. Whether Lee assigned or relinquished the extra-contractual causes of action at issue here turns on whether those causes of action were "incidents of ownership" as defined by federal case law under Section 2042 of the federal income tax code rather than by the broad definition proposed by the Appellees.[6]

**D.      Are Lee's Claims "Incidents of Ownership" for Purposes of 26 U.S.C. Section 2042 and Therefore Assigned or Relinquished to the Trustee?**

In their brief, the Appellees assert that Lee lacks standing to raise the extra-contractual causes of action because "the only way Lee could complain of those alleged misrepresentations is because he was the owner of the Policies, and his assertion of his claims in this action constitutes an impermissible 'incident of ownership' of the Policies."[7] Yet, the Appellees offer no federal estate tax law precedent to support this conclusion. In fact, a review of the federal cases under Section 2042 reveals the opposite conclusion. To understand what constitutes an "incident of

---

[6]As noted earlier, the Trust was created three years before the *Willson* litigation, and the Appellees were strangers to that Agreement. Accordingly, when interpreting the Trust-Agreement language, it is relevant to note that it was not designed to extinguish any future claims Lee may have had against the Appellees, but instead was an estate planning document created by Lee to shield the Policies from estate taxes at his death.

[7]Rogers makes the same argument in his brief.

12

ownership" under Section 2042, we must first examine its relationship to the Internal Revenue Code in general as well as the interests of taxpayers, like Lee, who seek to avoid federal estate tax liability for life insurance policies.

### 1.    Federal Estate Tax Principles

Title 26 U.S.C. § 2001 provides, "A tax is hereby imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  26 U.S.C. § 2001(a) (West, Westlaw through P.L. 114-219, Aug. 23, 2016).  Section 2001(b) defines the formula for computing the amount of estate tax due as the tax rate found in subsection 2001(c),

> (1) . . . on the sum of -- (A) the amount of the taxable estate, and (B) the amount of the adjusted taxable gifts, over (2) the aggregate amount of tax which would have been payable under chapter 12 with respect to gifts made by the decedent after December 31, 1976, if the modifications described in subsection (g) had been applicable at the time of such gifts."  Section 2031(a) states that the value of a decedent's "gross estate" "shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."  26 U.S.C. § 2031(a) (West, Westlaw through P.L. 114-219, Aug. 23, 2016).

Section 2042 provides that "the value of the gross estate shall include the value of all property[8] . . . (2) To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership. . . ."  26 U.S.C. § 2042(2) (West, Westlaw through P.O. 114-219, Aug. 23, 2016).  Thus, if, at the time of the decedent's death, the decedent possesses any of

---

[8]Although the statutory language uses the word "property," the title of Section 2042 is "Proceeds of life insurance."

the incidents of ownership in the Policies, the proceeds from those Policies are included in the decedent's gross estate. Otherwise, those proceeds pass outside the decedent's estate.[9]

### 2. Conflicting Goals of Settlors In Creating Irrevocable Trusts For Estate Tax Purposes

As one commentator has noted, "The United States taxes gifts made while an individual is living more leniently than it taxes wealth transfers at death" and "[a]s a result, effective gift tax rates are systematically lower than estate tax rates. . . ." Theodore S. Sims, *Timing Under A Unified Wealth Transfer Tax*, 51 U. CHI. L. REV. 34, 34–36 (1984). Therefore, if a taxpayer wishes to avoid the higher estate taxes, he can simply create an inter vivos transfer of the property. However, "the nature of modern wealth gives [a transferor] plenty of reasons to desire skilled management of . . . assets . . . as in the case of minors or beneficiaries who depend on trust income as their only means of support." *Estate of Wall v. Commissioner: An Answer to The Problem of Settlor Standing in Trust Law?* 99 N.W. U. L. REV. 1723, 1738–39 (2005). Nevertheless, once an inter vivos transfer has been completed, the transferor loses all control over how the property will be managed by the transferee. Accordingly, "[t]he [transferor's] desire to minimize taxes is therefore in tension with the desire to reserve control over the disposition of . . . assets beyond the date of [transfer]." *Id*. at 1724.

Irrevocable trusts are often used to accomplish these competing and opposite goals.

In order to reconcile these two opposing objectives, albeit imperfectly, the settlor often establishes an irrevocable trust. This type of trust is called irrevocable because its terms generally cannot be changed by the settlor once property is

---

[9]Accordingly, Section 2042 does not create an exception to the estate tax for life insurance proceeds, but instead defines those life insurance proceeds which are included in the decedent's gross estate. To avoid estate taxes, the settlor must create a transfer that does not fall within Section 2042's definition.

conveyed to the trust. Releasing control over the trust assets in this manner satisfies Congress's insistence on the surrender of control for gift treatment. Thus, while the settlor's freedom to fashion trust terms is limited only by one's imagination, the private irrevocable trust ideally achieves the two interests of the settlor, asset management and controlled income distribution to the various beneficiaries on the one hand, and the minimization of taxes paid (or maximization of the gift) on the other hand -- all without the possibility of future modification or input by the settlor.

*Id*. at 1738–39. Consequently, settlors creating irrevocable trusts for estate tax purposes seek to rid themselves of all "incidents of ownership" in the trust corpus so that it will not be included in their estate at death while retaining "some degree of control over the trust, even if only in a supervisory role, in order to ensure that the trust functions as envisioned." *Id*. at 1724.

Therefore, when interpreting the terms of the Trust Agreement in this case, we must keep in mind that Lee's assignment and relinquishment of the Policies was intended to be only as broad as was necessary to divest himself of any "incidents of ownership." There is no indication from the Trust language that he intended to convey anything else. If his extra-contractual claims are "incidents of ownership" in the Policies, then they were assigned or relinquished, but if they are not "incidents of ownership," then Lee retained those claims and has standing to assert them against the Appellees.

### 3. What Are "Incidents of Ownership" for Purposes of Section 2042?

The phrase "incidents of ownership" is defined as "the economic benefits of owning an insurance policy," including "the power to change the beneficiary, to surrender or cancel the policy, to assign the policy or revoke an assignment, to pledge the policy for a loan, or to obtain a loan from the insurer for the surrender of the value of the policy." *Estate of O'Daniel v. United States*, 6 F.3d 321, 325 (5th Cir. 1993) (citing 26 C.F.R. § 20.2402-1(c)(2)). The federal cases

15

considering this issue have generally agreed that "[w]hat [Congress] was attempting to reach in Section 2042 and some other sections was the power to dispose of property." *United States v. Rhode Island Hosp. Trust Co.*, 355 F.2d 7, 10–11 (1st Cir. 1966); *Estate of Dawson v. Comm'r of Internal Revenue*, 57 T.C. 837, 842 (1972) ("[W]here . . . a decedent at the time of his death neither has ownership of the policies (in the 'technical legal sense') nor possesses any of the substantive incidents of ownership, i.e., the powers of disposition, Section 2042 is inapplicable."). The cases vary, however, on how much control the decedent must retain before that control becomes an "incident of ownership."

The Fifth Circuit Court of Appeals has held that "by using the 'incidents of ownership' term Congress was attempting to tax the value of life insurance proceeds over which the insured at death still possessed a substantial degree of control." *Estate of Lumpkin v. Comm'r of Internal Revenue*, 474 F.2d 1092, 1096–97 (5th Cir. 1973). The Third Circuit Court of Appeals (relying on precedent from the Sixth Circuit) adopted a more restrictive reading of the phrase "incidents of ownership," concluding that "whether the right to exercise a settlement option is an incident of ownership depends in part upon whether the retention of such right is a 'substitute for testamentary disposition of property.'" *Connelly's Estate v. United States*, 551 F.2d 545, 551 (3rd Cir. 1977) (quoting *Estate of Freuhauf v. Comm'r of Internal Revenue*, 427 F.2d 80 (6th Cir. 1970)). The Second Circuit Court of Appeals ruled that the test for whether a settlor retains an "incident of ownership" in life insurance policies is whether "[the settlor] could have exercised his powers to derive for himself any economic benefits from these insurance policies." *Estate of Skifter v. Comm'r of Internal Revenue*, 468 F.2d 699, 702 (1972).

16

Yet, despite their differing analyses, the Fifth Circuit in *Lumpkin*, the Third Circuit in *Connelly*, and the Second Circuit in *Skifter* all agree that the phrase "incidents of ownership" was intended to mean only those powers to control the disposition (either to himself or to someone else) of life insurance policies or the income from such policies retained by the policy owner after he has transferred ownership of the policies to someone else. Essentially, if the decedent retains the power to control who will own or receive income from the policies during his lifetime or to determine who shall receive the policy proceeds after his death, then he has not really transferred the life insurance policies, and the proceeds from those policies should be included in his estate for purposes of calculating the estate tax.

Therefore, regardless of which formulation of the test is used, when deciding whether a decedent has retained any "incidents of ownership" of life insurance for purposes of Section 2042, "the key question is what power did decedent possess during his lifetime ***to control the disposition of the policy or the proceeds***?" *Estate of Margrave v. Comm'r of Internal Revenue*, 71 T.C. 13, 16 (1978) (emphasis added). As the First Circuit Court of Appeals framed the issue, "This is the relevant question . . . [:] Did [the decedent] have a capacity to do something ***to affect the disposition of the policy*** if he had wanted to?" *Rhode Island Hosp. Trust Co.*, 355 F.2d at 11 (emphasis added). The clear import of these decisions and the Trust's assignment and relinquishment provisions is that by limiting those provisions "to the purposes of the trust," Lee only transferred and relinquished those "rights and powers in such policies of insurance" which allowed him to exercise control over the disposition of the Policies or the proceeds of the policies, either (1) for himself, or (2) for the Trust beneficiaries. Paragraph 17 of the Trust confirms that

17

this was Lee's intent when it states that Lee relinquishes "forever all his possession or enjoyment *of*, *or right to*, *the income* from the Trust property, and all his ***rights and powers***, whether alone or in conjunction with others, ***to designate*** the person who shall possess or enjoy ***the Trust property or the income*** therefrom." (Emphasis added).

### E.    Application to the Present Case

When that test is applied to the extra-contractual causes of action raised by Lee against the Appellees, it becomes clear that those causes of action are not "incidents of ownership" in the Policies. The power to assert causes of action under the DTPA or Insurance Code arising out of alleged misrepresentations over the amount of paid premiums does not allow Lee to change the disposition of the policy proceeds in a manner contrary to the Trust's terms, either by redirecting those proceeds to himself or to some person other than the named beneficiaries.[10] Thus, they are not "substitutes for testamentary transfer." *Connelly's Estate*, 551 F.2d at 549. Nor do they invest Lee with "a substantial degree of control" over the disposition of the Policies or the proceeds of the Policies. *See Lumpkin*, 474 F.2d at 1096–97. Nor do they allow him to access economic benefits (cash value, loans against the policy, or policy proceeds) of the policies for himself. *See Skifter*, 468 F.2d at 702. Accordingly, the extra-contractual causes of action are not "incidents of ownership" of the policies.[11]

---

[10]To the extent the Appellees may assert that by not paying premiums Lee effectively had a right to cancel the Policies, which was an "incident of ownership," the federal cases have uniformly held that the "payment of premiums is not an incident of ownership under [26 U.S.C. §] 2042." *Estate of Leder v. C.I.R.*, 893 F.2d 237, 242 (10th Cir. 1989); *see also Estate of Headrick v. C.I.R.*, 918 F.2d 1263, 1268 (6th Cir. 1990); *First Nat'l Bank of Oregon v. United States*, 488 F.2d 575, 578 (9th Cir. 1973).

[11]Actually, for the reasons stated above, no cause of action would constitute an "incident of ownership" as defined by the federal cases interpreting Section 2042. Yet, as noted, Lee concedes that he has no standing to assert his negligence

Consequently, (1) because the Trust's purpose was to shield the Policies from estate taxes at his death, and (2) because to accomplish that purpose, Lee had to assign and/or relinquish all "right, title, and interest in and to said policies" which constituted "incidents of ownership" under Section 2042, and (3) because the extra-contractual causes of action at issue here are not "incidents of ownership" of the Policies as defined by federal law, then Lee did not assign those extra-contractual causes of action to the Trustee, and he has standing to assert them in this litigation.[12]

---

and breach of contract claims in this case. Lee is correct to make this concession because his negligence and breach of contract claims are not separate from the Policies. Rather, any duty giving rise to a negligence or breach of contract cause of action in this case can only arise from the terms and duties of the Policies. Ownership of the policies themselves is obviously an "incident of ownership"; therefore, a transfer of ownership of the Policies effects a transfer of any causes of action arising from the terms and duties of the Policies even if the causes of action themselves were not "incidents of ownership" in a technical sense.

By contrast, DTPA and Insurance Code causes of action are not "property-based claims" but instead are "personal claims," *see PPG Industries, Inc.*, 146 S.W.3d at 89; *Great American Insurance Co. v. Federal Insurance Co.*, 2006 WL 2263312 at *10; *Launius v. Allstate Ins. Co.*, 2007 WL 1135347, at *6; *American Southern Ins. Co. v. Buckley*, 748 F.Supp.2d at 626, and mere transfer of ownership of the policies did not thereby transfer ownership of those causes of action. Instead, the only way the extra-contractual claims in this case would have been transferred under the Trust's terms would be if those causes of action were "incidents of ownership" as defined by federal law. Because they are not "incidents of ownership," they were not transferred. Likewise, the extra-contractual causes of action could only have been relinquished if they were "incidents of ownership" in the policies, and, as shown above, they were not. Therefore, even though Lee does not have standing to assert the negligence and breach of contract causes of action, he does have standing to assert the DTPA and Insurance Code causes of action.

Finally, to the extent it may be argued, notwithstanding *PPG Industries, Inc.*, that even though Lee retained the DTPA and Insurance Code claims, he does not have standing to raise them because he no longer owns the policies, it must be remembered that "[a] plaintiff has standing to sue when [he] is personally aggrieved by the alleged wrong." *Magill v. Watson*, 409 S.W.3d 673 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Nootsie, Ltd. V. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Inasmuch as the Trustee paid nothing for the policies, he suffered no loss by their cancellation. Likewise, the beneficiaries have no loss because they had no enforceable expectation of receiving the policy proceeds. *See Rotating Servs. Indus., Inc. v. Harris*, 245 S.W.3d 476, 481 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("a named beneficiary has no vested interest in the policy proceeds unless one of the following conditions occurs: (1) a contract—separate from the policy itself—proscribes change in the designation of the beneficiary; (2) the policy itself does not authorize the owner of the policy to change the beneficiary; or (3) the insured dies.") (citing *Cates v. Cincinnati Life Ins. Co.*, 947 S.W.2d 608, 614 (Tex. App.—Texarkana 1997, no writ)). Only Lee has suffered any loss in this case. Consequently, because Lee never transferred ownership of the DPTA and Insurance Code Claims to the Trust, and because Lee is the only person who suffered any loss, then Lee has standing to assert the extra-contractual claims in this case.

[12]The Third Circuit noted that, "[u]nder Treasury Regulation Section 2042-1(c)(5), applicable state law must be given appropriate affect in determining whether the decedent possessed incidents of ownership." *Connelly*, 551 F.2d at 549 n.15; *see also Parsons v. United States*, 460 F.2d 228, 231 (5th Cir. 1972) (holding that "[i]n addition to [the] determination of [a] decedent's possession of economic benefits, the Commissioner is required to consider whether

19

While the Trust Agreement's assignment and relinquishment language might be entitled to a different interpretation in other contexts, Lee clearly intended only to shield the proceeds of the Policies from estate taxes at his death, not to extinguish any and all claims he may ever have against the Appellees in the future.[13]

---

ownership can be attributed under applicable state law"). Yet, *Connelly* makes clear that the issue of whether a power is an "incident of ownership" under Section 2042 is not decided by state law standards, but rather, whether under the federal standard state law would make the power a "substitute for a testamentary transfer." *Connelly*, 551 F.2d at 549 n.15 ("While the question of incidents of ownership is ultimately one of Federal tax law, we must look to the insurance law of New Jersey to determine whether an employee may assign his rights to exercise a settlement option."). Thus, in *Connelly*, the Third Circuit held that, because New Jersey law did not permit the decedent to assign his rights to exercise a settlement option under the policy at issue, the power to exercise the settlement option was not a "substitute for a testamentary transfer." *Id.*

Nothing in Texas law changes the result reached here. Clearly, Lee's causes of action under the DTPA and Texas Insurance Code for misrepresentations concerning the premiums are not testamentary transfers under Texas law. *See Hinson v. Hinson*, 280 S.W.2d 731, 733 (Tex. 1955) ("An instrument is not a will unless it is executed with testamentary intent. The *animus testandi* does not depend upon the maker's realization that he is making a will, or upon his designation of the instrument as a will, but upon his intention to create a revocable disposition of his property to take effect after his death."). By contrast, "[a] cause of action has been defined 'as a fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'" *A.H. Belo Corp. v. Blanton*, 129 S.W.2d 619, 621 (Tex. 1939) (citations omitted).

Nor do they constitute the retention of substantial control over disposition of the policy proceeds in question after they were transferred to the Trust. In recognizing a distinction between "personal" and "property-based" claims, holding that the latter are assignable, whereas, the former are not, the Texas Supreme Court noted that "property-based" claims follow the property upon transfer, but "personal claims" do not. *PPG Indus., Inc.*, 146 S.W.3d at 89. ("Clearly, if warranty claims are assignable because they are 'property-based,' DTPA claims must be something else; there must be a 'personal' aspect in being 'duped' that does not pass to subsequent buyers the way a warranty does."). Thus, Texas law recognizes that "personal" claims survive transfer of the property and have nothing to do with a right to control the transferred property after the transfer. Therefore, under even the most liberal Fifth Circuit standard, Lee's causes of action do not constitute "incidents of ownership" over the Policies under Section 2042. Because Lee only intended to transfer powers over the Policies which constitute "incidents of ownership," he did not transfer the causes of action at issue in this case.

[13]The Texas Supreme Court recently issued two opinions discussing contract interpretation demonstrating how and when surrounding context may be considered in contract interpretion. In *Hysaw v. Dawkins*, the Supreme Court did not look beyond the language of a will in ascertaining the testator's intent. *Hysaw v. Dawkins*, 483 S.W.3d 1, 7 (Tex. 2016) (We "focus not on 'what the testatrix intended to write, but the meaning of the words she actually used.'"). By contrast, in *Kachina Pipeline Co. v. Lillis*, the Supreme Court looked to the circumstances surrounding execution of the contract to interpret its meaning. *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 449 (Tex. 2015) ("[A] court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served." (quoting *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1994) (internal quotation marks omitted))).

While these two holdings appear to conflict, they actually correspond when one considers the contracts at issue in both cases. *Hysaw* required interpretation of a testatrix's conveyance of mineral royalty interests to her three children in her will, whereas, *Kachina Pipeline Co.* required interpretation of a contract for the sale and purchase of

## IV. Are Lee's Extra-Contractual Causes of Action Barred by the *Willson* Settlement Under the Doctrine of Res Judicata?

### A. Introduction

It is a fundamental principle of American jurisprudence that a person cannot be bound by a judgment in litigation to which he was not a party. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996). One exception to this principle is the doctrine of res judicata. *Id.* at 652–53. Under that doctrine, if a defendant proves the existence of (1) a prior final judgment on the merits by a court of competent jurisdiction, (2) an identity of parties or those in privity with them, and (3) a second action based on the same claims that were raised in the first action or could

---

natural gas. The business activity sought to be served by a will is the same in every will: the testatrix's intent is to convey her property to her heirs on her death. Therefore, "[t]he sense in which the words were used by the testator is the ultimate criterion." *Hysaw*, 483 S.W.3d at 7. By contrast, the meaning of terms in a purchase/sale agreement, such as the one examined in *Kachina Pipeline Co.*, can vary greatly depending upon the business activity surrounding the contract's drafting. *See generally Proctor v. Foxmeyer Drug Co.*, 884 S.W.2d 853, 861 (Tex. App.—Dallas 1994, no pet.) (holding that, although contract term "successor" usually applies only to corporate entities, "[b]ased on the kind and character of the contract before us, its purposes and circumstances, and its context, we conclude the term 'successor' was also intended to apply to the natural-person parties of the agreement").

The present case demonstrates this principle. If Lee had drafted the Trust Agreement in order to extinguish his claims against the Appellees as part of a negotiated settlement, the assignment and relinquishment language would be interpreted broadly to accomplish that purpose. But because his intent was to shield the Policies from estate taxes at his death by assigning and relinquishing all "incidents of ownership" in the policies to the trustee under 26 U.S.C. § 2042, then the assignment and relinquishment language should be interpreted from a more narrow viewpoint of whether the claims raised here were "incidents of ownership" in the Policies as defined by federal law. While context evidence cannot vary the terms of the agreement or create an ambiguity where none exists, it is available to identify the plain and ordinary meaning of the terms used in the contract.

Were we to apply the broad interpretation offered by the Appellees, we would have to conclude that notwithstanding Lee's undisputed purpose of creating the Trust to shield the policy proceeds from estate taxes, he inadvertently assigned or relinquished his extra-contractual claims. Yet, the goal of contract interpretation is to give effect to the parties' intent. Lee intended to convey "incidents of ownership" in the Policies, and the extra-contractual claims are not "incidents of ownership" in the Policies. Accordingly, the broad interpretation offered by Appellees becomes unsustainable because one cannot inadvertently make an intentional conveyance. For this reason, the determinative factor is not whether the Trust language could be interpreted as assigning or relinquishing the extra-contractual claims in a vacuum, but whether that language could be interpreted as assigning or relinquishing the extra-contractual claims in light of his undisputed purpose of ridding himself of all "incidents of ownership" as defined by federal estate tax law.

21

have been raised in the first action, then the prior judgment will bar the plaintiff's action in the second action. *Id*. at 653.

The parties agree that the final judgment in the *Willson* class-action litigation was a prior final judgment on the merits by a court of competent jurisdiction. Moreover, Lee contends, and the Appellees concede, that Lee was not a proper member of the *Willson* class and that he did not receive notice of the litigation.[14] Nevertheless, the Appellees argue that Lee's claims are barred by res judicata because he was in privity with the Trust (or Trustee), which was a party to the *Willson* litigation. As noted previously, Lee owned the DTPA and Insurance Code claims, but the Trustee was the party to the class action and received notice of the *Willson* litigation. Therefore, the question is whether Lee and the Trustee were in privity with one another such that Lee should be bound by the class-action settlement.

## B. Applicable Law

Forty-five years ago, the Texas Supreme Court held that "[t]here is no generally prevailing definition of privity which can be automatically applied to all cases involving the doctrine of res judicata[,] and the determination of who are privies requires careful examination into the circumstances of each case." *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 363 (Tex. 1971); *see also Getty Oil Co. v Ins. Co. of N. Am.*, 845 S.W.2d 794, 800 (Tex. 1992). Accordingly,"'[t]he word 'privy' includes those who control an action although not parties to it . . .; those whose

---

[14]The *Willson* class included persons or entities who had, at the time of a Policy's termination or as of the date of the settlement, an ownership interest in a life insurance policy issued by New York Life between January 1, 1982, and December 31, 1994. Lee transferred ownership of the Policies to the Trust on June 10, 1991. Thus, he did not have an ownership interest in the Policies at the time they were terminated (May 2012) or at the time of the entry of the *Willson* class-action settlement (July 1995). He was, therefore, not a proper member of the *Willson* class.

interests are represented by a party to the action . . . [, and] successors in interests." *Id*.; *see also Getty Oil*, 845 S.W.2d at 800–01.

Despite this broad definition, the application of res judicata to a non-party on the basis of privity with a party is limited by the non-party's Fourteenth Amendment due process rights. *See Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 794 (1996) ("[I]t would violate the Due Process Clause of the Fourteenth Amendment to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented.") (citing *Hansberry v. Lee*, 311 U.S. 32, 37 (1940)). This is because barring a subsequent suit where the non-party had no notice or adequate representation would "deprive [the non-parties] of their 'chose in action,' which [the United States Supreme Court has] held to be a protected property interest in its own right." *Richards*, 517 U.S. at 804 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429–30 (1982)). Accordingly, in the years since *Benson* was decided, courts have cautioned against the over-expansion of privity for purposes of applying res judicata to non-parties. *N. Atl. Distrib., Inc. v. Teamsters Local Union No. 430*, 497 F.Supp.2d 315, 321 (D.C.R.I. 2007) ("Courts have indeed found that a too-liberal use of preclusion principles to bind non-parties to a judgment entered in previous litigation raises due process concerns.") (citing *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 757 n.4 (1st Cir. 1994) ("The perils of nonparty preclusion [include] . . . the prospect that an overly expansive arrangement of the concept, or too free use of it, may endanger constitutional rights.")).

In 2008, the United States Supreme Court considered the due process implications of applying res judicata to non-parties in *Taylor v. Sturgell*, 553 U.S. 880 (2008). In *Taylor*, the

Supreme Court noted that, in contrast to "the discrete exceptions [to 'the general rule that a litigant is not bound by a judgment to which she was not a party'] that apply in 'limited circumstances,'" a "virtual representation" exception had arisen in the federal circuits which

> [w]ould authorize preclusion based on identity of interests and some kind of relationship between the parties and nonparties, shorn of the procedural protections proscribed in *Hansberry*, *Richards*, and [Federal Rule of Civil Procedure] 23. These protections, grounded in due process, could be circumvented were we to approve a virtual representation doctrine that allowed courts to "create de facto class actions at will."

*Id*. at 898, 901 (quoting *Tice v. Am. Airlines, Inc*., 162 F.3d 966, 973 (7th Cir. 1998)). Accordingly, the Supreme Court "disapprov[ed] the doctrine of preclusion by 'virtual representation.'" *Id*. at 885.

Instead, the Supreme Court limited non-party preclusion to traditional and recognized exceptions, which it grouped into six categories:[15] (1) cases where the non-party has agreed to be bound by the decision; (2) cases where the non-party is in one of "a variety of pre-existing substantive legal relationship[s]" with a party; (3) cases where the non-party was adequately represented by a party; (4) cases where a non-party assumed control over the prior litigation; (5) cases where the non-party was a party to the original action but seeks to litigate the subsequent litigation through a proxy; or (6) cases where "a special statutory scheme . . . 'expressly foreclose[es] successive litigation by nonlitigants' . . . if the scheme is otherwise consistent with due process." *Id*. at 895–96. Of those six categories, the present case potentially involves the

---

[15]The Supreme Court noted that "[t]he established grounds for nonparty preclusion could be organized differently" and that its list was "meant only to provide a framework for our considerations of virtual representation, not to establish a definite taxonomy." *Id*. at 893 n.6.

second and third traditional exceptions allowing preclusion of non-party claims under res judicata.[16]

The Supreme Court noted that the second category for "pre-existing 'substantive legal relationship[s]'" is "sometimes collectively referred to as 'privity.'" *Id*. at 894 n.8. The Supreme Court noted that such "relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id*. at 894. Yet, it used the term "substantive legal relationships" rather than "privity" because "the term 'privity,' . . . has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Id*. at 894 n.8. The Supreme Court also held that the third category includes "[r]epresentative suits with preclusive effect on nonparties includ[ing] properly conducted class actions and suits brought by trustees, guardians, and other fiduciaries." *Id*. at 894.

As the Supreme Court noted, these categories could be grouped differently. *Id*. at 893 n.6. Yet, regardless of how they are grouped, the second and third category share a common element: namely, each category requires the existence of a current or former "'substantive legal relationship" between the non-party and a party to the original litigation sufficient for a court to conclude that the non-party had notice and an opportunity to be heard in the former litigation.[17] *Id*. at 894 n.8.

---

[16]It is not disputed that Lee did not agree to be bound by the *Willson* decision, he did not assume control over that litigation, he does not seek to relitigate that case through proxy, and this case does not involve a special statutory scheme such as "bankruptcy and probate proceedings, . . . and *quo warranto* actions or other suits that, 'under [the governing] law, [may] be brought only on behalf of the public at large.'" *Taylor*, 553 U.S. at 895 (quoting *Richards*, 517 U.S. at 804).

[17]It is true that the Supreme Court only used the terms "substantive legal relationship" in connection with the second, traditional privity category. Yet, the Supreme Court noted that the categories were not exclusive, and the two

25

This common element is crucial to understanding the holding in *Taylor* and its implications on the application of res judicata to non-parties in Texas. The problem with the "virtual representation" exception was that it allowed these traditional res judicata applications to non-party claims to expand in such a way that they became, "in effect, a common-law kind of class action[,]" free of the due process protections required by "*Hansberry*, *Richards*, and [Federal Rule] 23." *Id*. at 901. The solution to that problem was to limit application of the privity/representative exceptions to "actual representations" rather than "virtual representations." The Supreme Court achieved its goal by limiting non-party claim preclusion to cases where the non-party had a former or existing "substantive legal relationship" with a party to the previous litigation.[18] Therefore, in order for a non-party to be bound under the privity/representative prongs of the res judicata defense in Texas in a manner which comports with the Due Process Clause of the Fourteenth

---

relationships are often included under the privity mantra. *Benson*, 468 S.W.2d at 363 ("[T]he word 'privy' includes those who control an action although not parties to it . . . ; those whose interests are represented by a party to the action . . . ; [and] successors in interests . . ."). Moreover, the second and third categories are very similar. In the traditional privity category, the relationship arises from the party's and non-party's common relationship to the same property (i.e., bailor/bailee, assignor/assignee); in the traditional representative category, the relationship arises from the party's and non-party's relationship to each other (i.e., trustee/beneficiary, guardian/ward). Therefore, whether the two categories are analyzed separately or together, and regardless of the wording used, to bind a non-party by a prior judgment, there must still exist a relationship between the non-party and a party, or between the non-party and property owned by a party, that is so substantive that a court can find that the non-party effectively had notice and an opportunity to be heard on the claim.

[18]The United States Court of Appeals for the Third Circuit reached the same conclusion in *Nationwide Mutual Fire Insurance Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 311 (3rd Cir. 2009). Noting that its pre-*Taylor* precedent requiring "a preexisting legal relationship between those contending over privity, before lifting the bar against collateral estoppel . . . was recently vindicated when the Supreme Court" decided *Taylor*, the Third Circuit concluded,

> We reject the notion of "virtual representation" as an exception to nonparty collateral estoppel to the extent it embraces anything more than the understanding that privity requires a prior legal or representative relationship between a party to the prior action and the nonparty against whom estoppel is asserted. Without such a relationship, there can be no estoppel.

*Id*. at 312.

26

Amendment,[19] the defendant must establish that there was a prior or ongoing "substantive legal relationship" between the non-party and a party to the previous litigation.[20]

Moreover, the legal relationship between the party and non-party must be "substantive." There is no practical difference between a "virtual representation" exception that establishes an "incidental legal relationship" between the party and non-party and an "incidental legal relationship" between the party and non-party which establishes privity.[21] Therefore, an expansion

---

[19]In *Taylor*, the Supreme Court struck down the virtual representation doctrine because it violated the Due Process Clause of the Fifth Amendment which is applicable to the federal government, not the states. Yet, this fact does not render *Taylor* inapplicable to the present case. Rather, the Supreme Court has held that the Fourteenth Amendment's due process requirement is applicable to the States in the same manner that the Fifth Amendment's due process requirement is applicable to the federal government. See *Dusenbery v. United States*, 534 U.S. 161, 166 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Likewise, lower federal courts have relied on Fourteenth Amendment Due Process cases for guidance in interpreting the Due Process Clause of the Fifth Amendment. *See Jebril v. Webber*, No. 08-10151, 2009 WL 2447551, at *3 (E.D. Mich. Aug. 7, 2009), (holding that because "the two amendments' due process clauses are substantially similar," opinions "interpreting the Fourteenth Amendment Due Process Clause provide important guidance for interpreting the due process requirements of the Fifth Amendment" (citing *Republic of Panama v. BCCI Holdings, S.A.*, 119 F.3d 935, 944 (11th Cir. 1997))). The reasoning behind these cases is equally valid in reverse: opinions "interpreting the [Fifth] Amendment Due Process Clause provide important guidance for interpreting the due process requirements of the [Fourteenth] Amendment." *Id*. Therefore, even though *Taylor* was decided under the Due Process Clause of the Fifth Amendment, the Supreme Court's reasoning applies equally to cases decided under Texas law by virtue of the Due Process Clause of the Fourteenth Amendment.

[20]Of course, the *Willson* litigation was a class action, and the Supreme Court noted in *Taylor* that "[r]epresentative suits with preclusive effect on nonparties include properly conducted class actions. . . ." *Taylor*, 553 U.S. at 894. The Court cited its previous ruling in *Martin v. Wilks*, where it held, "We have recognized an exception to the general rule [that non parties are not barred by prior judgments] when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989). Yet, in *Martin* the Supreme Court cited *Hansberry*, where it held "the judgment in a 'class' or 'representative' suit, to which some **members** of the class are parties, may bind **members** of the class . . . ." *Hansberry*, 311 U.S. at 41–42 (emphasis added). Thus, references in *Taylor*, *Martin*, and *Hansberry*, to non-parties bound by class-action judgments mean those parties who were members of the class which was represented by the class representatives i.e., those persons who met the requirements for membership in the defined class. As noted previously, Lee was not a member of the class certified in the *Willson* litigation. Therefore, Lee is not a person who can be bound by the *Willson* class-action judgment by virtue of class member status. If Lee is bound by the *Willson* judgment in this case, it is because of the actual representation exceptions, not because of the class-action exception.

[21]The "virtual representative" doctrine created an "incidental legal relationship" between the party and non-party in the sense that it made the party a representative of the non-party's interests in the previous litigation. Therefore, the only difference between "virtual representations" and an expansion of privity to include incidental legal relationships

27

of privity to include incidental legal relationships would permit under the guise of privity what was prohibited by *Taylor*. By doing so, the prohibited "virtual relationship" would merely become an expansion of privity to include incidental legal relationships, thereby circumventing the due process "procedural protections prescribed in *Hansberry*, *Richards*, and [Federal Rule 23]." *Taylor*, 553 U.S. at 901. Consequently, the legal relationship between the party and non-party must be "substantive" if it is to support an application of res judicata to bar the non-party's claims.

The Supreme Court did not define what constitutes a "substantive legal relationship," but it did give several examples. Among these were "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor" as well as "suits brought by trustees, guardians, and other fiduciaries." *Id.* at 894. Moreover, the Supreme Court did not limit the scope of those traditional examples of "substantive legal relationships," but only addressed those "cases [where] lower courts have relied on virtual representation to extend nonparty preclusion beyond the latter doctrine's proper bounds."[22] *Id.* at 904. Therefore, in the present case, in order to determine whether Lee's claims are barred by res judicata, we must decide whether Lee had a "substantive

---

is semantic: in the first instance, the "virtual representation doctrine" establishes the incidental legal relationship that establishes privity, whereas in the second instance, the incidental legal relationship establishes privity. Because "privity" and "virtual representation" were both exceptions to the rule that non-parties are not bound by prior judgments, then the effect is identical regardless of whether the incidental legal relationship is called a "virtual relationship" or "privity."

[22] The Supreme Court noted,

> [Many opinions use the term "virtual representation" in reaching results at least arguably defensible on established grounds. In these cases, dropping the "virtual representation" label would lead to clearer analysis with little, if any, change in the outcomes. *See Tice*, 162 F.3d at 971 ("[T]he term 'virtual representation' has cast more shadows than light on the problem of [nonparty preclusion].").

*Taylor*, 553 U.S. at 904.

legal relationship" with the Trustee comparable to the relationships identified by the Supreme Court in *Taylor*, such that he was actually represented by the Trustee in the *Willson* litigation.

## C.     Analysis

The Appellees claim that Lee and the Trust were in privity because:   (1) Lee and the Trust had several substantive legal relationships as settlor and trustee of the Trust, assignor and assignee of the rights in the Trust Agreement, and as preceding and succeeding owners of the Policies; (2) Lee's extra-contractual claims were represented by the Trust and the other named plaintiffs;[23] and (3) the trust designated the trustee as having the power to bind "those interested in the trust."

### 1.   Lee's and the Trustee's Relationships as Settlor and Trustee, Assignor And Assignee, and Preceding and Succeeding Owners of the Policies Were Not "Substantive Legal Relationships" Through Which Lee Was Bound by The *Willson* Judgment

#### a.     Privity Based on Settlor And Trustee Relationship

The Appellees assert that Lee's relationship to the Trustee, as Settlor, was sufficient to bar his litigation of the extra-contractual claims in this case.  Few Texas cases have considered the scope of the relationship between a settlor and a trustee, but those cases which have addressed that question strongly suggest that the relationship between a settlor and a trustee is not the type of "substantive legal relationship" necessary under *Taylor* and due process to bar the settlor's claims

_____

[23]The Appellees make this argument, but cite little, if any, evidence in support of their position.  We note that under Texas property law, a trust is not a legal entity; instead, it is a fiduciary relationship with respect to property.  *See* TEX. PROP. CODE ANN. § 111.004(4) (West 2014).  Extraordinary fiduciary standards are imposed upon a trustee who handles the trust property solely for the *beneficiaries'* benefit.  *Id.*  While it is apparent that a trustee has a fiduciary duty to protect the beneficiaries' interests and that he has the power to bind beneficiaries during a legal proceeding, the Appellees have not demonstrated, that the same fiduciary relationship exists between a trustee and a settlor of a trust; in this case, Lee.  Further, we have found nothing to support their position.

by a prior judgment to which the settlor was not a party. At best, there is an "incidental legal relationship" between the two.

To begin with, a settlor who "[u]nder the terms of the . . . Trust . . . do[es] not manage any of the aspects of the . . . Trust and do[es] not stand to inherit any of the trust assets" is not an "interested person" who has standing to bring an action against a trustee or to bring other proceedings related to a trust under the Texas Property Code. *See Gonzalez v. DeLeon*, No. 04-14-00751-CV, 2015 WL 5037396, at *1–2 (Tex. App—San Antonio Aug. 26, 2015, pet. dism'd) (mem. op.) (citing TEX. PROP. CODE ANN. §§ 111.004(7), 115.001(a) (West 2014). Likewise, a trustee does not have standing to sue a settlor for breach of fiduciary duty.

> Absent some assignment of duty to the settlor in the trust instrument, a trustee has no cause of action to sue the settlor of a trust for a breach of fiduciary duty to the trust beneficiaries. *Cf. Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006) (noting that under Texas law, a trust refers to "the fiduciary relationship governing the *trustee* with respect to the trust property") (emphasis added) (quoting *Huie v. DeShazo*, 922 S.W.2d 920, 926 (Tex. 1996) (per curiam)). A trust settlor has no fiduciary obligation to a trust beneficiary once that trust is created, and control of the trust assets is vested with the trustee. *See id.*; *see also* TEX. PROP. CODE ANN. § 111.004(4) (Vernon 2007 & Supp.) (defining "express trust").

*Alpert v. Riley*, 274 S.W.3d 277, 292 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Accordingly, the few Texas cases addressing the legal relationship between a settlor and a trustee have concluded that neither has standing to sue the other, at least where "[u]nder the terms of the . . . Trust . . . the Settlor do[es] not manage any of the aspects of the . . . Trust and do[es] not stand to inherit any of the trust assets." *Gonzalez*, 2015 WL 5037396, at *1–2.[24]

---

[24]Section 111.004(7) of the Property Code states, "Whether a person, excluding a trustee or named beneficiary, is an interested person may vary from time to time and must be determined according to the particular purposes of and matter involved in the proceeding." Therefore, we do not hold that a settlor could never be an "interested party" as defined by the Property Code, only that a settlor is not an "interested party" under the facts in this case.

This precedent is consistent with Section 200 of the Second Restatement of Trusts, which states, "No one except a beneficiary or one suing on his behalf can maintain a suit against the trustee to enforce the trust or to enjoin or obtain redress for a breach of trust." RESTATEMENT (SECOND) OF TRUSTS § 200 (Am. Law Inst. 1959). Comment b to that section goes on to state,

> *Settlor and his successors in interest.* Neither the settlor nor his heirs or personal representatives, as such, can maintain a suit against the trustee to enforce a trust or to enjoin or obtain redress for a breach of trust. Where, however, the settlor retains an interest in the trust property,[25] he can of course maintain a suit against the trustee to protect that interest. Thus, if the settlor is also a beneficiary of the trust, or if he has an interest by way of resulting trust, or if he has reserved power to revoke the trust, he can maintain a suit against the trustee to protect his interest. So also, if the settlor makes a contract with the trustee, he can maintain an action on the contract with the trustee. The trustee, however, merely by accepting the trust and agreeing to perform his duties as trustee does not make a contract with the settlor to perform the trust which the settlor could enforce.

RESTATEMENT (SECOND) TRUSTS § 200, cmt. b.

Consequently, because (1) Lee, as settlor, is not an "interested person" as defined by the Property Code; (2) Lee neither owed a duty to the Trust nor was owed any duties by the trust; and (3) as Settlor of a "private irrevocable trust . . . , [he lost] the possibility of modification or input on the Trust once the Trust [was] created[,]" *see Estate of Wall v. Commissioner*, 99 Nw. U. L. REV. at 1739, then Lee and the trustee do not have a "substantial legal relationship" with each other sufficient to create privity for purposes of res judicata. Although there may be an "incidental legal relationship" between them in the sense that Lee created the Trust and the Trustee

---

[25]Because the causes of action at issue are extra-contractual and personal to Lee, they do not constitute an "interest in the trust property" retained by Lee. *See PPG Indus., Inc.*, 146 S.W.3d at 89 ("Clearly, if warranty claims are assignable because they are 'property based,' DTPA claims must be something else; there must be a personal aspect in being 'duped' that does not pass to subsequent buyers the way a warranty does.").

subsequently managed it, there is not the "substantive legal relationship" necessary to satisfy due process for purposes of binding Lee by the *Willson* judgment.

### b. Privity Based on Assignee/Assignor and Preceding/Succeeding Owner Relationships

The Appellees also assert that the relationship of Lee and the Trustee as assignee and assignor of the Policies as well as their relationship as preceding and succeeding owners of the Policies establishes privity for purposes of res judicata. The Appellees point to *Amstadt* in support of their contention that Lee and the Trust were in privity by virtue of their relationship as preceding and succeeding owners of the Policies. In *Amstadt*, the Texas Supreme Court considered whether plaintiffs who "bought their homes from people who had previously sued and recovered damages caused by the plumbing systems" were bound by the prior judgments under the res judicata doctrine. *Amstadt*, 919 S.W.2d at 648. The Supreme Court concluded that

> [p]rivity exists if the parties share an identity of interests in the basic legal right that is the subject of litigation. To determine whether a prior and later lawsuit involve the same basic subject matter, we focus on the factual basis of the complaint. If the second plaintiffs seek to relitigate the matter which was the subject of the earlier litigation, res judicata bars the suit even if the second plaintiffs do not allege causes of action identical to those asserted by the first. Res judicata also precludes a second action on claims that arise out of the same subject matter and which might have been litigated in the first suit.

*Id*. at 653.

Yet, in *Amstadt*, the succeeding property owners were bound by the preceding owners' prior litigation over the plumbing issues. The Appellees cite to no case, and we have found none, where the preceding property owner is bound by the succeeding owner's litigation occurring after the transfer. In fact, the Supreme Court in *Benson* only referred to "successors in interests," not

32

"predecessors in interests," when it identified the traditional privy relationships. *Benson*, 468 S.W.2d at 363. Moreover, the reason the succeeding owner is in privity with the preceding owner in the first place is because the succeeding owner acquired ownership of the property from the preceding owner, and therefore, acquired whatever rights that the owner had in the property at the time of the sale. Accordingly, the prior litigation involving the property runs with the property from the preceding owner to the succeeding owner.

If the reverse of that situation created privity, then we would have to find that the preceding owner is bound by the succeeding owner's litigation over an issue occurring after transfer of the property for claims which were not part of the transfer. In that scenario, even though the succeeding owner never acquired the claims, the succeeding owner's subsequent litigation would somehow bar the preceding owner's right to assert those non-transferred claims because the preceding owner used to own the property through which the preceding owner acquired his claims. The preceding owner's claim would therefore be barred even though he never had notice or an opportunity to be heard in the subsequent litigation. Applying res judicata to the preceding owner for claims not assigned or transferred to the subsequent owner would violate the preceding owner's rights to due process.[26] Therefore, Lee's and the Trustee's relationships as preceding and

---

[26]This case presents the mirror image of the fact situation in *PPG Industries, Inc. v. JMB/Houston Centers Partners, Ltd.*, where the Supreme Court held that DTPA claims are not assignable. The facts in that case demonstrate why privity based on preceding and succeeding owners does not bind the preceding owner in the same way it binds a succeeding owner.

In *PPG Industries, Inc.*, the former building owner, HCC, purchased windows from the manufacturer, PPG. *PPG Indus., Inc.*, 146 S.W.3d at 83. HCC then sold the building to JMB and assigned to JMB all warranties relating to the building; JMB "waived all DTPA claims against HCC." *Id*. JMB subsequently sued PPG under the DTPA for problems associated with the windows. *Id*. The Supreme Court held that JMB did not have standing to raise the DTPA claims because DTPA claims are not assignable. *Id*. at 89. Consequently, HCC retained its DTPA claims notwithstanding the sale of the building to JMB.

succeeding owners and as assignee and assignor of the Policies do not rise to the level of the "substantive legal relationships" necessary to bar Lee's extra-contractual claims.

**2. Lee's Extra-Contractual Claims Were Not Represented by the Trust and the Other Named Plaintiffs, and the Trust Language Designating the Trustee as Having the Power To Bind "Those Interested in The Trust" Is Not Applicable**

We previously explained that Lee did not assign or relinquish his extra-contractual claims to the Trustee when he created the Trust because he only assigned or relinquished those "rights, title and interest in and to said policies" which constituted incidents of ownership for estate tax purposes, and his extra-contractual claims do not constitute incidents of ownership. We also explained that Lee and the Trustee did not have a "substantive legal relationship" which would create privity sufficient to bind Lee by the *Willson* litigation. Accordingly, neither of these arguments is sufficient to bar Lee's extra-contractual claims by res judicata.

The argument that the Trust language providing that the Trust "shall be binding and conclusive upon the insurance companies and upon all persons interested in the Trust" likewise fails for the simple reason that Lee was not a "[person] interested in the Trust." We noted previously that, under the facts of this case, Lee is not an "interested party" to a Trust under the Texas Property Code and neither owes any duties to nor is owed any duties by the Trust which can

---

Under the Appellees' position, even though JMB never acquired HCC's DTPA claims and had no standing to assert them, HCC would nevertheless be barred from raising those claims against PPG because it was in privity with JMB when JMB unsuccessfully sued PPG. As a result, HCC would be deprived of its DTPA claims even though it was not a party to and never had an opportunity to be heard in the previous litigation, either personally or through a representative. This result would violate HCC's right to due process.

On the other hand, if HCC had sued PPG for its DTPA claims arising out of the defective windows before it transferred the building to JMB, then JMB would be barred by HCC's prior litigation because of their relationship as preceding and succeeding owners or assignee and assignor. That would be the exact fact situation presented in *Amstadt* and is the type of relationship contemplated by the preceding and succeeding owners and assignee and assignor privity relationships.

34

serve as a basis for litigation by him against the Trustee. Furthermore, and for the reasons noted above, the Trustee did not represent Lee's interests in the *Willson* litigation. Consequently, the quoted Trust language is not sufficient to bar Lee's extra-contractual claims by res judicata.

## V. Conclusion

Lee concedes that he does not have standing to raise his negligence and breach of contract claims against the Appellees. Accordingly, we affirm the trial court's summary judgment on Lee's negligence and breach of contract causes of action. However, for the foregoing reasons, Lee does have standing to assert his DTPA and Insurance Code claims against Appellees, and those claims are not barred by the *Willson* litigation. Therefore, we reverse the trial court's summary judgment on Lee's DTPA and Insurance Code causes of action. We remand this case to the trial court for further proceedings consistent with this opinion.

Ralph K. Burgess
Justice

Date Submitted: March 30, 2016
Date Decided: October 6, 2016

35