# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-20318
CONSOLIDATED WITH
No. 23-20443

United States Court of Appeals
Fifth Circuit

**FILED**
September 18, 2024

Lyle W. Cayce
Clerk

---

OCCIDENTAL PETROLEUM CORPORATION,

*Plaintiff—Appellee*,

ANADARKO PETROLEUM CORPORATION,

*Intervenor Plaintiff—Appellee*,

*versus*

WELLS FARGO BANK, N.A.,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-1126

---

Before WILLETT, WILSON, and RAMIREZ, *Circuit Judges*.
CORY T. WILSON, *Circuit Judge*:

Anadarko and Wells Fargo entered a Trust Agreement, whereby Wells Fargo acted as trustee of funds held for the benefit of certain Anadarko employees. After Occidental acquired Anadarko in 2019, the Trust held a substantial amount of Occidental stock. In a December 2019 e-mail chain,

No. 23-20318
c/w No. 23-20443

Wells Fargo and Occidental agreed to sell that stock between January 6 and January 10, 2020. But Wells Fargo failed to follow through with that plan and did not sell the stock until March 2020. By that time, the value of the stock had drastically decreased, resulting in loss of value of over $30,000,000. Occidental sued Wells Fargo for breach of contract based on both the e-mail chain and the Trust Agreement. The district court granted summary judgment in Occidental's favor.

We hold that the 2019 e-mail chain is not a contract, but Wells Fargo is judicially estopped from arguing that the Trust Agreement is not a contract. And Wells Fargo breached that agreement by failing to sell the stock as planned. Accordingly, we affirm the district court's summary judgment for Occidental. We also affirm the district court's calculation of damages, dismissal of Wells Fargo's counterclaim and affirmative defenses, and award of attorney's fees.

## I.

## A.

Anadarko Petroleum Corporation entered into a Benefits Trust Agreement with Wachovia Bank in 1995. Anadarko was the trust settlor and appointed Wachovia as trustee. In 2008, Wells Fargo acquired Wachovia and became trustee under an amended trust agreement, the one at issue in this case (Trust Agreement). The Trust Agreement formed a "rabbi" trust (Trust) that held assets to pay deferred compensation to high-level Anadarko employees. *See Bank of Am., N.A. v. Moglia*, 330 F.3d 942, 944 (7th Cir. 2003) (generally explaining structure and purpose of rabbi trusts).[1] As a rabbi

---

[1] "A rabbi trust . . . is a trust created by a corporation or other institution for the benefit of one or more of its executives . . . ." *Moglia*, 330 F.3d at 944. "The main reason . . . for such a trust is that, should the control of the institution change, the new

trust, the Trust was structured differently than a traditional trust. Though the Trust was irrevocable, its assets always belonged to Anadarko, were subject to Anadarko's creditors, and would revert to Anadarko after all payments to covered employees were complete. Conversely, the employees had no rights or interests in the Trust's assets, only "unsecured contractual rights" against Anadarko.

The Trust Agreement imposed several duties upon Wells Fargo. Under Section 5.5 of the agreement, Wells Fargo was required "[t]o invest and reinvest part or all of the Trust Fund in any real or personal property . . . and to diversify such investments so as to minimize the risk of large losses unless under the circumstances it [was] clearly prudent not to do so[.]" That section also mandated that Wells Fargo "perform all other acts which, in the Trustee's judgment, [were] appropriate for the proper management, investment, and distribution of the Trust Fund." Section 5.5 incorporated applicable duties under Texas law, including the duty to "invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust." Tex. Prop. Code Ann. § 117.004(a).

Initially, Anadarko managed the investment of the Trust's funds, and Wells Fargo had "no discretionary control over, nor any other discretion regarding, the investment or reinvestment of any asset of the Trust." But that changed when Occidental Petroleum Corporation acquired Anadarko in 2019. That acquisition constituted a "Change of Control" under the Trust Agreement, which gave Wells Fargo discretion to make investment decisions. The change also allowed Occidental to request the return of excess

---

management might reduce the old executives' compensation, or even fire them; the trust . . . cushions the fall." *Id.*

No. 23-20318
c/w No. 23-20443

Trust assets when the value of the Trust was greater than 125% of the obligations owed to the covered employees.

After the acquisition, the Trust contained 1,907,100 shares of Occidental common stock and $413 million in cash. Wells Fargo appointed investment manager Nikki Tanner to manage the Trust's assets. Tanner "did not think it would be prudent" to hold so much Occidental stock in the Trust. In fact, holding that much undiversified stock violated Wells Fargo's internal guidelines. Accordingly, Tanner and other Wells Fargo employees started planning to diversify the Trust's assets. In October 2019, Tanner met with Occidental representatives to present her preliminary investment strategy. They discussed selling all the Occidental stock and reinvesting the proceeds to create a diversified portfolio. But the parties agreed that selling all the stock at one time was imprudent, as it might have adverse tax consequences or negatively affect the value of the stock.

Tanner followed up with Occidental in a series of e-mails, seeking input as to how the Occidental stock should be sold. In response to Wells Fargo's request, Occidental proposed the following plan, via a December 17, 2019 e-mail:

> [Occidental] would appreciate if Wells [Fargo] could agree to a ratable liquidation plan for [Occidental] Stock as follows: Beginning January 6, 2020, sell 381,420 shares each day over the course of the week with a final liquidation on January 10, 2020[.] 1,907,100/5 = 381,420[.]

On December 19, Tanner responded that "Wells Fargo accepts your recommendation for the ratable liquidation plan for [Occidental] Stock . . . ." She then repeated the terms of Occidental's proposal verbatim.

However, effectuating the stock sale turned out to be easier said than done. To sell the Occidental shares, Wells Fargo was required first to move

4

them to a Depository Trust Company (DTC) account. Before January 6, 2020, only 733,500 shares of Occidental stock were held in the DTC account. The remaining 1,173,600 shares were held by Equiniti Trust Company, Occidental's transfer agent.

On January 6, Wells Fargo sold 381,420 shares of Occidental stock as planned. But on January 7, Wells Fargo was only able to sell 352,080 shares, the remaining balance in the DTC account. That same day, Tanner submitted a request to Equiniti to sell 29,340 shares to complete the day's planned liquidation. Equiniti purportedly told her it could not accept her request because it lacked a "medallion stamp." So Tanner submitted another request to Equiniti on January 8 to sell the 29,340 shares. Equiniti executed both requests, one on January 9 and the other on January 10.

Not realizing Equiniti had executed Tanner's request to sell 29,340 shares twice, Wells Fargo sent three more requests to Equiniti on January 9 to sell 381,420 shares on each of the three succeeding days to complete the original plan. But because Equiniti sold an extra 29,340 shares on January 10, it did not have enough shares to complete Wells Fargo's requests. Equiniti therefore rejected all three requests.

Equiniti followed up with a letter on January 16 asking Wells Fargo to "clarify the total number of shares [it] would like to sell." But Wells Fargo did not discover the letter until February 14, after it contacted Equiniti to check on the status of the requests. Almost two weeks later, on February 26, Wells Fargo informed Occidental that the requests had not been completed and that more than one million shares of Occidental stock still had not been sold. Occidental immediately coordinated a call with Equiniti, which advised Wells Fargo to transfer the remaining shares to the DTC account for sale. Even then, Wells Fargo struggled to effect the transfer of the shares to the DTC account, taking until March 18 to do so. The remaining Occidental

shares were then sold on March 20. But because of the onset of the COVID-19 pandemic and the resulting stock market downturn, Wells Fargo sold the remaining stock at a much lower price: It sold the stock in January for between $44.75 and $46.03 per share; in March it sold the remaining stock for $9.98 per share.

In April 2021, Occidental requested that Wells Fargo return the Trust's surplus, as authorized by the Trust Agreement. Wells Fargo returned $23,696,213.01. In Occidental's telling, had Wells Fargo sold the stock in January 2020 according to plan, the distribution would have been over $30,000,000 higher.

## B.

Occidental sued Wells Fargo on April 6, 2021. It first alleged that the December 2019 e-mail chain between Tanner and Occidental formed a contract and that Wells Fargo breached that contract by failing to sell all the Trust's shares between January 6 and January 10. In July 2021, Occidental amended its complaint to include a claim for breach of fiduciary duty. Occidental sought over $30,000,000 in damages, based on the amount Wells Fargo could have distributed to Occidental if all the shares had been sold in January 2020 rather than March 2020.

After answering the complaint, Wells Fargo moved to dismiss the fiduciary-duty claim. Among other things, Wells Fargo argued that it did not owe any fiduciary duty to Occidental because Occidental was not a beneficiary under the Trust Agreement. Rather, Wells Fargo stated that it had "limited, largely administrative contractual obligations to [Anadarko and Occidental] under [Section 5.5 of] the Trust Agreement." Thus, it contended that "Occidental's tort claims must fail because the relationship between Wells Fargo and Occidental is governed by a contract," namely the

6

No. 23-20318
c/w No. 23-20443

Trust Agreement. Wells Fargo reaffirmed its position to the district court during a hearing on its motion:

> The Court: And I want to just go right to the heart of what I think is the claim. If I view . . . Occidental as not a beneficiary as defined under the trust but as an interested person, what is the duty owing to an interested person by the trustee?
>
> Wells Fargo's Attorney: Your Honor, there is no fiduciary duty owed [by] Wells Fargo.
>
> The Court: What is the duty?
>
> Wells Fargo's Attorney: The duty would be the contractual duties that are set forth in the trust agreement, but those are quite limited with respect to Occidental . . . .

At the hearing and in its subsequent detailed order, the district court wrestled with the nature of the relationship between Wells Fargo and Occidental created by the Trust Agreement. Ultimately, the district court sided with Wells Fargo and dismissed the fiduciary-duty claim, holding that "[t]he nature of Occidental's interest in the Trust does not appear to meet the requirements for a fiduciary duty owed by Wells Fargo to Occidental."

In January 2022, Occidental filed a second amended complaint, adding Anadarko as a plaintiff.[2] In June 2022, Occidental sought leave to amend the complaint a third time to add a claim for breach of contract, namely, the Trust Agreement. Wells Fargo answered and asserted a counterclaim against Occidental, alleging that Occidental was vicariously

---

[2] For simplicity, we refer to Occidental and Anadarko collectively as "Occidental" for the rest of the opinion. Wells Fargo contends that it can only be held liable by Anadarko for breach of the Trust Agreement because Anadarko was the settlor of the Trust. But the plain language of the Trust Agreement shows that the agreement was between Wells Fargo and the "Company," which the document defines as "Anadarko Petroleum Company, and any successor thereto," to include Occidental.

liable for its agent Equiniti's actions. Wells Fargo also asserted fourteen affirmative defenses in its answer, including failure to mitigate, waiver, and impossibility.

After discovery, both parties moved for summary judgment as to liability. In response to Occidental's argument that Wells Fargo breached the Trust Agreement, Wells Fargo averred that "[a]n alleged failure to adhere to the requirements of a trust instrument (like the Trust Agreement) does not . . . state a claim for breach of contract" because "a trustee's agreement to subject itself to the duties of administering a trust is not contractual in nature." The district court expressly rejected that argument in its order, noting that "Wells Fargo's argument that the Trust Agreement is not a contract is inconsistent with the position it has taken throughout this litigation." The court instead held that the Trust Agreement was a contract and that Wells Fargo breached that contract by failing to manage the Trust prudently, as required by Section 5.5.

The district court also determined that the December 2019 e-mail chain was a contract that Wells Fargo breached by failing to sell the Occidental shares between January 6 and January 10, 2020. As to Wells Fargo's counterclaim, the district court concluded that Wells Fargo failed to allege that Equiniti owed it a duty under Texas law for which Occidental could be vicariously liable. Finally, the court rejected Wells Fargo's affirmative defenses because Wells Fargo neither "recited the elements of its affirmative defenses, nor pointed to evidence supporting its affirmative defenses." Based on those rulings, the district court granted Occidental's motion for summary judgment as to liability and denied Wells Fargo's motion.

Occidental then moved for summary judgment as to damages. It argued that, had Wells Fargo sold all the stock between January 6 and January

10 as originally planned, the April 2021 distribution payment would have been $38,008,313 higher. Wells Fargo countered that Occidental did not factor in the parties' agreement to reinvest funds resulting from the sale of the Occidental stock, as outlined in the parties' October 2019 meeting and the Trust Agreement. According to Wells Fargo, had the Trust assets been reinvested as planned, the new assets would also have been negatively affected by the onset of the COVID-19 pandemic, and therefore the differential in Trust value would have been much less than Occidental asserted. Wells Fargo thus proffered damages models based on proceeds it could have disbursed assuming reinvestment.

The district court accepted Occidental's calculations and rejected Wells Fargo's:

> [W]hether Wells Fargo would have actually reinvested the proceeds after the planned January 2020 sales . . . [was] . . . speculative and not supported by the record . . . . In other words, Wells Fargo [could] not show that the results of the reinvestments not made would be a probable result of the breach.

The court therefore granted summary judgment as to damages in Occidental's favor and awarded $38,008,313 in damages.

Wells Fargo timely appealed the district court's final judgment. Thereafter, Occidental moved for attorney's fees, and the district court awarded $1,497,529.66 in fees. Wells Fargo timely appealed that order as well, and we granted Wells Fargo's motion to consolidate the two appeals.

## II.

"We review grants of summary judgment *de novo*, applying the same standard as the district court." *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) (citing *Templet v. Hydrochem Inc.*, 367 F.3d 473, 477 (5th

Cir. 2004)). "[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "We can affirm the district court's grant of summary judgment on any ground supported by the record." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (citing *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014)).

## III.

Wells Fargo raises five issues on appeal, contending that: (A) neither the December 2019 e-mail chain nor the Trust Agreement was a contract; (B) the district court erred by disregarding reinvestment when calculating damages; (C) the court erred in dismissing Wells Fargo's counterclaim against Occidental based on Equiniti's actions; (D) the court improperly disregarded Wells Fargo's affirmative defenses when granting Occidental summary judgment; and (E) the court erred by not segregating legal fees owed by Wells Fargo in its individual capacity and those it owed as trustee. We first address the contractual issues and then attend to Wells Fargo's remaining arguments.

## A.

Wells Fargo argues that the district court erred in granting summary judgment on liability because neither the December 2019 e-mail chain nor the Trust Agreement was a contract. As to the December 2019 e-mail chain, Wells Fargo contends, among other things, that the e-mail exchange was not a contract because it lacked consideration. We agree.

Under Texas law, "[a] bilateral contract must be based upon a valid consideration, in other words, mutuality of obligation." *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied). "Consideration may consist of either benefits or detriments to

the contracting parties . . . ." *Id.* However, "[a] contract that lacks mutuality of obligation is illusory and void and thus unenforceable." *Id.* The problem with casting the December 2019 e-mail chain as a contract is that it lacks such mutuality. Though Wells Fargo unambiguously agreed to transfer the stock between January 6 and January 10, Occidental offered nothing in exchange. In other words, Wells Fargo received no benefit from the e-mail exchange; nor did Occidental suffer any detriment. Accordingly, the December 2019 e-mail chain, standing alone, did not create an enforceable contract.

Wells Fargo next contends that the Trust Agreement was not a contract because its duties thereunder "stem[med] from the special nature of the relation between trustee and beneficiary." But that argument is barred by judicial estoppel.[3]

Judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996).[4] "The doctrine prevents internal inconsistency, precludes litigants from 'playing fast and loose' with the courts, and prohibits parties from deliberately changing positions based upon the exigencies of the moment." *Id.* (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)). This court has articulated two elements that must be present for judicial estoppel

---

[3] Occidental first raised judicial estoppel in its reply in support of its motion for summary judgment as to liability, and again in its appellate brief. Accordingly, we may consider this issue. *See Huffman v. Union Pac. R.R.*, 675 F.3d 412, 418 (5th Cir. 2012) ("Only in an egregious case will we accept a judicial estoppel argument first raised on appeal . . . .").

[4] Judicial estoppel may apply to issues of fact, as well as issues of law. *See Republic of Ecuador v. Connor*, 708 F.3d 651, 656–57 (5th Cir. 2013). "From the standpoint of equity, . . . a change of legal position can be just as abusive of court processes and an opposing party as deliberate factual flip-flopping." *Id.* at 657.

No. 23-20318
c/w No. 23-20443

to apply: (1) the position of the party being estopped must be "clearly inconsistent with its previous [position]"; and (2) "that party must have convinced the court to accept that previous position." *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000)). A third consideration is "whether absent estoppel 'the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party.'" *In re 3 Star Props., L.L.C.*, 6 F.4th 595, 605 (5th Cir. 2021) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).[5]

Here, the first element is met because Wells Fargo's position that the Trust Agreement is not a contract is clearly inconsistent with the position it took in litigating its motion to dismiss. In urging the district court to dismiss Occidental's fiduciary-duty claim, Wells Fargo repeatedly described the relationship between Wells Fargo and Occidental as contractual in nature. Indeed, Wells Fargo expressly stated that "Occidental's tort claims must fail because the relationship between Wells Fargo and Occidental is governed by a contract." But now, Wells Fargo argues that "[t]he district court erred in finding a contract based on the Trust Agreement because a trust agreement is not a contract." Instead, Wells Fargo contends that its relationship with Occidental was governed by the "special nature of the relation between

---

[5] Wells Fargo addresses only the first two elements of the test for judicial estoppel in its argument. Our dissenting colleague also discusses the third consideration, "unfair advantage/detriment," and, with the help of out-of-circuit caselaw, emphasizes a fourth: the bank's intent, or lack thereof, as bearing on whether estoppel applies here. *See post*, at 29–31. JUDGE RAMIREZ concludes that judicial estoppel is unwarranted because there is "no apparent record evidence" that Wells Fargo made its inconsistent statements "with the requisite manipulative intent." *Id.* at 30–31. Assuming *arguendo* that judicial estoppel turns in part on a party's intent, and with great respect for our esteemed colleague, we disagree that the contradictory assertions of Well Fargo's counsel incident to the opportune change in position were mere "unthinking or confused blunder[s.]" *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973).

trustee and beneficiary." This type of bait-and-switch is the exact behavior judicial estoppel seeks to prevent. *See Ergo*, 73 F.3d at 598.

Wells Fargo attempts to argue that judicial estoppel does not apply because the district court did not rely on its previous position. But the record belies that contention. Given the peculiar structure of rabbi trusts, the district court grappled with the nature of the relationship between Wells Fargo and Occidental created by the Trust Agreement. Before ruling on Wells Fargo's motion to dismiss Occidental's fiduciary-duty claim, the district court expressly asked Wells Fargo "[i]f . . . Occidental [was] not a beneficiary as defined under the trust but [was] an interested person, what is the duty owing to an interested person by the trustee?" Wells Fargo responded unequivocally: "The duty would be the contractual duties that are set forth in the trust agreement." Relying on that and Wells Fargo's other representations, the district court dismissed Occidental's fiduciary-duty claim.

Any lingering doubt about the district court's reliance on Wells Fargo's statements is dispelled by the district court's summary judgment order on Occidental's breach-of-contract claim. When Wells Fargo attempted to argue that the duties under the Trust Agreement were not "contractual in nature," the district court itself all but expressly invoked judicial estoppel. Specifically, the court stated that "Wells Fargo's argument that the Trust Agreement is not a contract is inconsistent with the position it has taken throughout this litigation."[6] Thus, the second element of judicial estoppel is easily met.

---

[6] The dissent emphasizes that "the district court did not explain its application of judicial estoppel" and posits that we should remand for clarification of whether and how estoppel applies. *Post*, at 28. JUDGE RAMIREZ cautions, wisely, that only in "an 'especially egregious' case . . . may [we] consider judicial estoppel *de novo*." *Id.* (quoting

No. 23-20318
c/w No. 23-20443

The third consideration—whether, absent estoppel, Wells Fargo would gain an unfair advantage or Occidental would suffer an unfair detriment—also tips in favor of estoppel. Arguing that its duties to Occidental were contractual, not fiduciary, in nature, Wells Fargo convinced the district court to dismiss Occidental's fiduciary-duty claim. Taking its cue from Wells Fargo and the court's ruling, Occidental then proceeded under a contract theory, eventually prevailing. Foreclosing Occidental's second path to relief by allowing Wells Fargo to reverse its argument for dismissing the first strikes us as enabling a classic "heads I win/tails you lose" position. Doing so would confer upon Wells Fargo the unfair advantage of defeating both claims using diametrically opposed arguments and unfairly leave Occidental with no recourse despite adapting its claims in the wake of the district court's initial ruling. In short, a textbook case for judicial estoppel.

And because Wells Fargo is estopped from arguing that the Trust Agreement is not a contract, the only question that remains is whether Wells Fargo breached that agreement. Wells Fargo asserts that "[e]ven if the Trust Agreement could create a contract, nothing in the record established what those duties were or how they were breached." That is not so. In finding that Wells Fargo breached the Trust Agreement, the district court referenced the duties outlined in Section 5.5 of the Trust Agreement. Specifically, Wells Fargo was required "[t]o invest and reinvest part or all of the Trust Fund . . . and to diversify such investments so as to minimize the

_____

*United States ex rel. Am. Bank v. C.I.T. Const. Inc. of Tex.*, 944 F.2d 253, 258 (5th Cir. 1991) (addressing "waiver produced by a failure to plead judicial estoppel")). But whether this is an "especially egregious" case or not, we read the record to demonstrate that the district court called out Wells Fargo's inconsistent positions in rejecting Wells Fargo's opposition to Occidental's motion for summary judgment on its breach-of-contract claims. Thus, while the district court did not explicitly invoke or analyze estoppel, Occidental raised the issue before that court, as it does on appeal—and it takes little analysis to discern the inconsistent positions that Wells Fargo has espoused in both the district court and here.

risk of large losses unless under the circumstances it [was] clearly prudent not to do so." It was also required "[t]o perform all other acts which, in the Trustee's judgment, [were] appropriate for the proper management, investment, and distribution of the Trust Fund."

Given the large amount of Occidental stock held by the Trust after Occidental's acquisition of Anadarko, Wells Fargo knew it was prudent to diversify the Trust's assets. And the parties agreed that it was unwise to sell all the stock at once, in large part because of the negative impact it might have on the stock's value. Accordingly, Occidental and Wells Fargo formed the plan outlined in the December 2019 e-mail chain to sell the stock over the course of five days. But as the district court noted, "through a series of clumsy missteps," Wells Fargo "simply failed" to execute the plan. The undisputed record supports the district court's conclusion that "Wells Fargo failed to implement what it agreed to do to prudently manage the Trust, in breach of its obligations under the Trust Agreement." In sum, while the 2019 e-mail plan was not a contract, it is evidence that Wells Fargo breached its obligations to Occidental under the Trust Agreement. The court therefore properly granted summary judgment for Occidental as to Wells Fargo's breach of the Trust Agreement.

We do not see this result as contravening Texas trust law. Generally, the relationship between a trustee and a beneficiary is not contractual in nature, and "the remedies of the beneficiary against the trustee are exclusively equitable." RESTATEMENT (SECOND) OF TRUSTS § 197 (AM. L. INST. 1959); *see Alpert v. Riley*, 274 S.W.3d 277, 291–92 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (outlining the duties of a trustee to a beneficiary). But a settlor who retains an independent interest in trust property and is not a beneficiary does not have standing to pursue such equitable remedies. *See Lee v. Rogers Agency*, 517 S.W.3d 137, 160 (Tex. App.—Texarkana 2016, pet. denied); *cf.* TEX. PROP. CODE § 115.001(c)

No. 23-20318
c/w No. 23-20443

("The court may intervene in the administration of a trust to the extent that the court's jurisdiction is invoked by an interested person[.]"). Yet the settlor must have an adequate remedy to protect those interests. Therefore, the settlor can maintain an action on a contract with the trustee. *Lee*, 517 S.W.3d at 160.

Here, the Trust Agreement does not define Occidental as a beneficiary; indeed, neither are the covered employees, so it is unclear whether there *are* trust beneficiaries in the traditional sense. Regardless, Wells Fargo convinced the district court that Occidental was not a beneficiary and thus was not owed fiduciary duties by Wells Fargo.[7] Yet, as settlor, Occidental retained several interests in the Trust assets. For example, the assets were to revert to Occidental upon termination of the Trust. More relevant, Occidental also had a reversionary interest in excess Trust funds. Considering these facts, the district court logically reasoned that "[i]f . . . Occidental [was] not a beneficiary as defined under the trust," it was at least "an interested person," such that it could sue to protect those interests, *Lee*, 517 S.W.3d at 160. That logic prompted the court's next question to Wells Fargo: "[W]hat is the duty owing to an interested person by the trustee?" Given the peculiarities of the rabbi trust at issue, we see no ground in Texas trust law to quarrel with Wells Fargo's response: "The duty would be the contractual duties that are set forth in the trust agreement."

**B.**

---

[7] Neither party argues on appeal that the district court erred by dismissing Occidental's fiduciary-duty claim or by finding that Occidental was not a beneficiary under the Trust Agreement. The party presentation principle thus counsels against further exploring those issues on appeal. *See Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 673–74 (5th Cir. 2023) ("[W]e rely on the parties to frame the issues for decision" and "normally decide only questions presented by the parties." (internal quotations and citations omitted)).

Wells Fargo next contends that the district court erred when calculating damages. "Determining the proper method for measuring damages is a question of law, which we review *de novo*." *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 834 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *accord Spectrum Ass'n Mgmt. of Tex., L.L.C. v. Lifetime HOA Mgmt. L.L.C.*, 5 F.4th 560, 564 (5th Cir. 2021) (stating that this court reviews *de novo* "conclusions of law underlying a damages award") (citing *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006)). "The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed." *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). "The correct standard for assessing loss of benefit of the bargain damages measures the difference between the value as represented and the value as received by the nonbreaching party." *Sacks v. Hall*, 481 S.W.3d 238, 247 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

Applying this law, the district court first calculated the estimated sale proceeds had Wells Fargo sold the shares as planned from January 6 to January 10. It then subtracted from that number the amount Occidental actually received when Wells Fargo sold the shares. Finally, it subtracted the fees, expenses, and interest that each sale involved, bringing the final amount to $38,008,313. Wells Fargo does not dispute that math. Rather, it asserts that "[r]einvestment of the sale proceeds was an essential, unambiguous term" of the Trust Agreement that should have been factored into the district court's calculations. The court rejected that argument, finding that reinvestment calculations were "speculative and not supported by the record." We agree.

"To recover damages for breach of contract, a plaintiff must show the damages sought were the natural, probable, and foreseeable consequence of

the defendant's conduct or were within the parties' contemplation." *City of Dallas v. Vills. of Forest Hills, L.P., Phase I*, 931 S.W.2d 601, 605 (Tex. App.—Dallas 1996, no writ). "A party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural." *Id.* Although these principles typically serve to prevent plaintiffs from receiving an undeserved windfall, we see no reason they should not also apply to prevent defendants from receiving a reverse windfall—by avoiding payment of otherwise foreseeable damages incurred by plaintiffs. *Cf. Williams v. J.P. Morgan & Co.*, 248 F. Supp. 2d 320, 332–33 (S.D.N.Y. 2003) (rejecting a damages calculation based upon "the hypothetical performance of an investment of the proceeds of sale in the market").

There is scant support in the record that Wells Fargo would have reinvested money earned from the sale of Occidental stock before the stock market crash caused by COVID-19. If anything, as the district court found, the evidence points the other way. True, the Trust Agreement required Wells Fargo "[t]o . . . reinvest part or all of the Trust Fund in any real or personal property . . . and to diversify such investments so as to minimize the risk of large losses." But there is no evidence that the Trust Agreement required Wells Fargo to reinvest the proceeds immediately after the sale of Occidental stock, nor is there evidence that Wells Fargo intended—or actually took steps—to do so.

Most tellingly, Wells Fargo did not attempt to reinvest any of the proceeds from the stock successfully sold in January during the month when it believed all the stock had been sold. Indeed, had Wells Fargo tried to do so, it would have discovered much sooner than February 14 that the stock sale had not gone off as planned. Moreover, once all the stock was finally liquidated in March, Wells Fargo did not begin preparing to reinvest Trust assets until April and May 2020. As the district court noted, "[t]he record

shows at best an attenuated connection between [Wells Fargo's] breach . . . and any reinvestments." Stated differently, hypothetical losses caused by hypothetical reinvestment of hypothetical funds are not a "probable" or "foreseeable" consequence of Wells Fargo's conduct. *See Forest Hills*, 931 S.W.2d at 605. The district court did not err by declining to consider reinvestment of the Trust assets when it calculated damages.

## C.

Wells Fargo also asserts that the district court improperly dismissed Wells Fargo's counterclaim against Occidental, which was grounded on Equiniti's alleged actions as Occidental's agent. In dismissing that claim, the district court concluded that Wells Fargo failed to allege that Equiniti owed it a duty under Texas law. Again, we agree.

"It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability." *Perry v. S.N.*, 973 S.W.2d 301, 304 (Tex. 1998) (quoting *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993)). As in its complaint, Wells Fargo cites several federal regulations governing a transfer agent's conduct and argues that Equiniti's alleged violation of those regulations "amount[s] to negligence per se." *See* 17 C.F.R. §§ 240.17Ad-2, 240.17Ad-5, 240.17Ad-12, 240.17Ad-15. Wells Fargo reasons that in "alleging Equiniti's violation of [those] regulations[,] . . . Wells Fargo necessarily alleged that Equiniti, as Occidental's agent, owed Wells Fargo a duty under those regulations." But "[n]egligence *per se* is not a separate cause of action that exists independently of a common-law negligence cause of action." *Thomas v. Uzoka*, 290 S.W.3d 437, 445 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). "Rather, negligence *per se* is merely one *method* of proving a breach of duty" that already exists. *Id.*

In other words, Wells Fargo's argument begs the question: Before proving that Equiniti's alleged violation of the cited federal regulations

constituted a breach, Wells Fargo must show that there was something to breach, i.e., a duty.  As in the district court, Wells Fargo fails to explain what its proffered regulations require, much less how they give rise to a common law duty under Texas law.  Without that, Wells Fargo's counterclaim necessarily fails.  *See Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) ("To survive summary judgment, the nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action.").  The district court therefore did not err in granting summary judgment for Occidental as to Wells Fargo's counterclaim.

## D.

Wells Fargo next argues that the district court erred by disregarding Wells Fargo's affirmative defenses in granting Occidental summary judgment.  It suggests that Occidental was required preemptively to refute all fourteen affirmative defenses raised in Wells Fargo's answer, identifying the essential elements of each defense and demonstrating the absence of evidence supporting those elements.

But "[a]n affirmative defense places the burden of proof on the party pleading it."  *F.T.C. v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 322 (5th Cir. 2004).  Wells Fargo's argument thus "runs afoul of well-established authority confirming that [Wells Fargo] may not rest on [its] pleading and must provide evidence showing there is a genuine dispute of material fact." *See Northfield Ins. Co. v. Pizano*, No. 2:19-cv-1198, 2023 WL 4107975, at *4 (E.D. Cal. June 21, 2023) (applying *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), in the affirmative defense context).  Indeed, Federal Rule of Civil Procedure 56 "requires the nonmoving party to go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  Thus,

No. 23-20318
c/w No. 23-20443

while an affirmative defense will defeat summary judgment in favor of a plaintiff if the defendant supports each element of the defense with summary judgment evidence, the plaintiff is not obligated to negate each element of an affirmative defense to succeed at the summary judgment stage. *See McCollough v. Johnson, Rodenberg & Lauinger*, 587 F. Supp. 2d 1170, 1176 (D. Mont. 2008).

Even so, Wells Fargo contends it has substantiated genuine disputes of material fact to support at least three of its affirmative defenses: failure to mitigate, waiver, and impossibility. Regarding failure to mitigate and waiver, Wells Fargo points to Occidental's "laissez-faire conduct" and failure to take any action after learning Wells Fargo had not sold the Occidental shares as planned. And as to impossibility, Wells Fargo cites Equiniti's alleged refusal to guarantee that the Occidental shares could be transferred on any specific timeline.

Assuming *arguendo* that this limited evidence is material for purposes of summary judgment, Wells Fargo fails to show that there was any genuine dispute about it that would overcome Occidental's entitlement to judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (explaining that when "the moving party has carried its [summary judgment] burden," "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Rather, Occidental conclusively undermined Wells Fargo's contentions by submitting undisputed evidence that (1) Occidental objected when the shares were not sold, (2) Occidental could not sell the shares itself, (3) Wells Fargo concealed from Occidental the fact that it had not sold the shares for weeks, (4) Wells Fargo did not seek Occidental's help in selling the shares, and (5) Wells Fargo could have transferred the shares to the DTC account any time after August 2019. Against this record, the district court did not err in granting summary judgment notwithstanding Wells Fargo's largely conclusory

No. 23-20318
c/w No. 23-20443

affirmative defenses. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (holding that summary judgment is appropriate when the evidence is "so one-sided that one party must prevail as a matter of law").

## E.

Lastly, Wells Fargo contends that the district court erred by not segregating the legal fees owed by Wells Fargo individually and the legal fees owed by Wells Fargo as trustee. "The standard of review for an award of attorneys' fees is whether the trial court abused its discretion in making the award." *Iscavo Avocados USA, L.L.C. v. Pryor*, 953 F.3d 316, 319 (5th Cir. 2020) (alteration accepted) (quoting *DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d 421, 433 (5th Cir. 2003)).

The district court concluded that there was no basis in the record or the caselaw for distinguishing between Wells Fargo individually and as trustee. Indeed, Occidental brought claims against one defendant, Wells Fargo Bank, N.A. and did not differentiate that defendant's "capacities." Wells Fargo cites one case to argue that Occidental should have segregated its fees according to Wells Fargo's actions in its different legal capacities. *See Gilbreath v. Horan*, 682 S.W.3d 454, 563–64 (Tex. App.—Houston [1st Dist.] 2023, pet. denied). But in *Gilbreath* the plaintiff sued "separate and distinct legal entities," each with their own respective obligations to the plaintiff. *See id.* at 564. Wells Fargo cites no cases showing that attorney's fees must be segregated when a single entity allegedly acted in different capacities. Accordingly, it has not shown that the district court abused its discretion. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc) (noting that a district court abuses its discretion if it relies on erroneous conclusions of law).

## IV.

22

No. 23-20318
c/w No. 23-20443

Wells Fargo is bound by its assertion in the district court that the Trust Agreement was a contract. Because Wells Fargo breached that agreement by botching the liquidation of the Occidental shares held by the Trust, the district court properly granted summary judgment for Occidental. From there, the district court properly calculated damages, dismissed Wells Fargo's counterclaim and affirmative defenses, and awarded attorney's fees.

For the reasons discussed, the district court's judgment is

AFFIRMED.

No. 23-20318
c/w No. 23-20443

Irma Carrillo Ramirez, *Circuit Judge*, concurring in part and dissenting in part:

Because the application of judicial estoppel in this case does not achieve substantial justice, I respectfully dissent.

I

Judicial estoppel is an equitable doctrine that "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996); *see Davis v. Wakelee*, 156 U.S. 680, 689 (1895) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."). "The central, extremely important purpose of the doctrine is 'to protect the integrity of the judicial process and to prevent unfair and manipulative use of the court system by litigants.'" *United States v. Farrar*, 876 F.3d 702, 709 (5th Cir. 2017) (quoting *United States v. McCaskey*, 9 F.3d 368, 379 (5th Cir. 1993)).

Three primary factors are considered in determining whether judicial estoppel should apply:

> [(1)] whether "a party's later position is 'clearly inconsistent' with its earlier position," [(2)] "whether the party has succeeded in persuading a court to accept that party's earlier position," and [(3)] whether absent estoppel "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party."

24

No. 23-20318
c/w No. 23-20443

*Sed Holdings, L.L.C. v. TM Prop. Sols., L.L.C. (In re 3 Star Props., L.L.C.)*, 6 F.4th 595, 605 (5th Cir. 2021) (original alterations omitted) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)). As the Supreme Court has made clear, however, these factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," as other details may be considered depending on the circumstances. *New Hampshire*, 532 U.S. at 751. Judicial estoppel is not "an inexorable command"; "the propriety of applying" the doctrine "is dictated by the 'specific factual context.'" *Carmichael v. Balke (In re Imperial Petrol. Recovery Corp.)*, 84 F.4th 264, 273 (5th Cir. 2023) (per curiam) (brackets omitted) (quoting *New Hampshire*, 532 U.S. at 749); *see United States ex rel. Long v. GSD & M Idea City, LLC*, 798 F.3d 265, 271 (5th Cir. 2015) (holding that courts are not required to apply judicial estoppel "in every instance that they determine its elements have been met"). Because the lodestar when applying judicial estoppel is "achiev[ing] substantial justice," courts should apply the doctrine "guided by a sense of fairness" and "with the facts of the particular dispute in mind." *Reed v. City of Arlington*, 650 F.3d 571, 574, 576 (5th Cir. 2011) (en banc).

II

This Court has examined judicial estoppel (1) when the doctrine is first analyzed at the trial-court level, *e.g.*, *Wells Fargo Bank, N.A. v. Oparaji (In re Oparaji)*, 698 F.3d 231, 235 (5th Cir. 2012), and (2) on appeal in the first instance, but only in "especially egregious" cases, *United States for Use of Am. Bank v. C.I.T. Constr. Inc. of Tex.*, 944 F.2d 253, 258 (5th Cir. 1991). When judicial estoppel is first considered determines the applicable standard of review. If a district court has considered judicial estoppel, then we review for abuse of discretion. *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 924 (5th Cir. 2018) (per curiam). Otherwise, we either consider judicial estoppel *de novo* in

25

No. 23-20318
c/w No. 23-20443

"especially egregious" cases or remand for further consideration. *Cf., e.g.*, *Madison v. Chalmette Refin., L.L.C.*, 637 F.3d 551, 557 (5th Cir. 2011) (finding abuse of discretion where the analysis in the order on appeal was insufficient to allow for appellate review); *United States v. Brick*, 905 F.2d 1092, 1100 (7th Cir. 1990) (same).

Here, the esteemed district court never expressly stated that it was applying judicial estoppel. It did not discuss or analyze all the primary factors considered in determining whether judicial estoppel should apply. The discussion in its summary-judgment opinion that speaks to judicial estoppel is brief:

> Wells Fargo responds that the Trust Agreement did not impose contractual duties but instead imposed only the fiduciary obligations of a Trustee. Wells Fargo argues that those duties are the general duties of prudent trust management imposed by the Texas Property Code and common law, duties that cannot give rise to a common-law breach of contract claim.
>
> As noted above, Wells Fargo's argument that the Trust Agreement is not a contract is inconsistent with the position it has taken throughout this litigation.[1] For example, at the hearing

---

[1] Wells Fargo made three inconsistent statements in its partial motion to dismiss the first amended complaint: (1) "because the Trust Agreement governs Occidental's and Wells Fargo's relationship and all of Occidental's purported injuries arise from the Trust Agreement, the economic loss/contorts doctrine bars Occidental's breach of fiduciary duty claim"; (2) "Occidental's tort claims must fail because the relationship between Wells Fargo and Occidental [wa]s governed by a contract"; and (3) "[u]nder these circumstances, the economic loss rule precludes recovery in tort for what is, at base, a contractual claim." And in response to the district court's question during the oral argument about what duty was owed to Occidental if it was not a beneficiary under the Trust Agreement, Wells Fargo's counsel argued:

> The duty would be the contractual duties that are set forth in the trust agreement, but those are quite limited with respect to Occidental. There are provisions in the trust agreement that allow Occidental to make plan

No. 23-20318
c/w No. 23-20443

on the motions to dismiss, counsel had the following exchange with the court:

| Counsel: | "Your Honor, there is no fiduciary duty owed to Wells Fargo." |
|---|---|
| The court: | "What is the duty?" |
| Counsel: | "The duty would the contractual duties that are set forth in the Trust Agreement[.]" |

*See Occidental Petrol. Corp. v. Wells Fargo Bank, N.A.*, 622 F. Supp. 3d 495, 513 (S.D. Tex. 2022). In addition, district courts ordinarily conduct the initial judicial-estoppel analysis and proceed no further on the estopped issue. *See, e.g.*, *Gabarick v. Laurin Mar. (Am.), Inc.*, No. 09-CV-4466, 2013 WL 12092512, at *2–3 (E.D. La. June 12, 2013), *aff'd*, 753 F.3d 550 (5th Cir. 2014). Here, the district court addressed why Wells Fargo's contract-versus-trust argument was incorrect, concluding that "Wells Fargo has not pointed to evidence showing genuine factual disputes material to determining that the Trust Agreement was a binding contract between the parties that, in itself and in combination with other documents, imposed specific contractual duties on Wells Fargo." *Occidental Petrol. Corp.*, 622 F. Supp. 3d at 513. The district court's ruling could be reasonably read as a determination on the merits since the district court (1) addressed judicial estoppel in less than

---

payments to employees and request to the trustee for reimbursement. There is no allegation in this case that there's any breach of that provision. There are some discretionary provisions in the trust that allow Occidental to make certain requests for reversionary payments, but those payments are only – those payments are to be made in the trustee's sole discretion. So, there's no basis for a fiduciary duty certainly but even a contract claim on that – on those provisions. There are also – the only other contractual relationships between Wells Fargo and Occidental under the trust agreement would – would arise at the conclusion of the trust after the plan payments have already been made.

explicit fashion; (2) did not consider each judicial-estoppel factor; and (3) analyzed the underlying merits of the argument Wells Fargo advanced. *See id.*

Judicial estoppel is a doctrine whose application is committed to the district court's discretion—however, "discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975) (quoting *United States v. Burr*, 25 F. Cas. 30, 35 (C.C.D. Va. 1807) (No. 14,692D) (Marshall, C.J.)); *see Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) ("Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike."). Absent a demonstration of what facts and law the district court considered when exercising its discretion, we are unable to conduct "a fair and full appellate review" of the district court's exercise of its discretion. *FDIC v. Calhoun*, 34 F.3d 1291, 1297 (5th Cir. 1994) (explaining that creating a record permits "a fair and full appellate review of the decision" for abuse of discretion). Because the district court did not explain its application of judicial estoppel, we cannot properly evaluate whether it abused its discretion.

Therefore, unless this is an "especially egregious" case in which we may consider judicial estoppel *de novo* in the first instance, then we must remand "for a more detailed factual determination by the [district] court." *Cantieri Navali Riuniti v. M/V Skyptron*, 802 F.2d 160, 165 (5th Cir. 1986). This is not an egregious case, so remand is proper.

## III

Assuming *arguendo* that this is an "especially egregious" case in which we may examine judicial estoppel *de novo* in the first instance, the doctrine should not apply for four reasons: (1) the record does not reflect that Wells

No. 23-20318
c/w No. 23-20443

Fargo gained an unfair advantage through its inconsistent statements; (2) the record does not reflect that Wells Fargo's inconsistent statements were made with the intent requisite to apply judicial estoppel; (3) application of the doctrine creates a legal relationship between Occidental and Wells Fargo that does not exist and the parties never intended; and (4) applying judicial estoppel here effectively functions as a draconian sanction against Wells Fargo.

A

Where, as here, we must determine whether judicial estoppel should apply to "contrary statements of opinion on the law," there must be an "indication" that, in convincing the district court of "its contrary position," Wells Fargo "gained an inequitable advantage." *Republic of Ecuador v. Connor*, 708 F.3d 651, 656 (5th Cir. 2013); *see* 18B Charles Alan Wright et al., Federal Practice and Procedure § 4477 (3d ed.) (finding "[u]nfair advantage or disadvantage" to be a "clear concern" for courts when considering judicial estoppel).[2]

In contrast to factual statements, statements of opinion on the law accepted by a court may be unwound prior to final judgment—the legal

---

[2] Whether the party asserting inconsistent statements does so to gain an unfair advantage arises frequently in the bankruptcy context. For instance, debtors are "required to report, under penalty of perjury, the existence of any pending litigation or potential lawsuits." *Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 333 (5th Cir. 2004). Yet when debtors report no potential lawsuits, file a lawsuit soon thereafter, and were "aware of the facts underlying the claim and their continuing obligation to disclose its existence," judicial estoppel likely applies because the debtors would "reap a windfall" were they "able to recover on the undisclosed claim without having disclosed it." *See id.* at 333, 335–36. Because the series of events would provide the debtors "an unfair advantage or impose an unfair detriment on" creditors, *see New Hampshire*, 532 U.S. at 751, these debtors were precluded from reopening their case and amending the petition, *Superior Crewboats*, 374 F.3d at 336.

principles governing the case have not been cemented because the law-of-the-case has not yet attached. This doctrine, among other things, precludes a district court from reconsidering an issue of fact or law decided on appeal. *See United States v. Bazemore*, 839 F.3d 379, 385 (5th Cir. 2016) (per curiam). Vacating the relevant orders and remanding the case would allow the district court to address the remaining issues with the parties and guide the case towards resolution on the merits.[3] But once the mandate issues, that will be the first instance in which advantage and detriment will inure to either party—Wells Fargo will lose without first receiving a substantive advantage and Occidental will win without first enduring a substantive detriment.

On this record, it is unclear that Wells Fargo's inconsistent statements caused it to gain an inequitable advantage or imposed an unfair detriment on Occidental so as to warrant application of judicial estoppel.

B

There is also no apparent record evidence demonstrating that Wells Fargo made inconsistent statements to manipulate the judicial process. Judicial estoppel serves to "prevent[] parties from playing fast and loose with the courts to suit the exigencies of self interest." *Coastal Plains*, 179 F.3d at 205 (citation omitted); *Superior Crewboats*, 374 F.3d at 334–35 ("[J]udicial estoppel is invoked where 'intentional self-contradiction is being used as a

---

[3] Because judicial estoppel is "intended to protect the judicial system[] rather than the litigants," prejudice to an opposing party unrelated to litigation outcome is not properly considered in the judicial-estoppel calculation. *See Brown Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 205 (5th Cir. 1999); *see also Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 214 (1st Cir. 1987) ("[H]arm to an opponent is not an invariable prerequisite to judicial estoppel."); *In re Cassidy*, 892 F.2d 637, 641 n.2 (7th Cir. 1990) ("[P]rejudice to the opponent from the change of position is not a necessary element of judicial estoppel.").

No. 23-20318
c/w No. 23-20443

means of obtaining unfair advantage in a forum provided for suitors seeking justice." (citation omitted)). Typically, the party against which judicial estoppel runs must have acted in a manner demonstrating an intent to take advantage of the judicial system. *See Peoples State Bank v. Ge. Elec. Cap. Corp. (In re Ark-La-Tex Timber Co.)*, 482 F.3d 319, 333 (5th Cir. 2007) ("[T]he vice that judicial estoppel is designed to prevent is the 'cold manipulation' of the courts to the detriment of the public." (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995))); *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973) (applying Texas law) (emphasizing that judicial estoppel "looks toward cold manipulation and not an unthinking or confused blunder"); *see also, e.g.*, *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing."); *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980) ("Jurisdictions recognizing judicial estoppel also refuse to apply the doctrine when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court. An unintentional error is not penalized by precluding subsequent assertion of the truth.").

Wells Fargo's statements regarding contractual duties under the Trust Agreement are inconsistent, but the record does not reflect that this inconsistency stems from an intentional effort to take advantage or "cold manipulation." Absent record evidence demonstrating that Wells Fargo's inconsistent statements were made with the requisite manipulative intent, judicial estoppel is not warranted.

## C

Applying judicial estoppel here results in Occidental's success on its claim for breach of contract as to the Trust Agreement. But no contract exists

No. 23-20318
c/w No. 23-20443

between Occidental and Wells Fargo—they are parties to a trust arrangement.

1

Trusts and contracts are distinct legal arrangements. A trust is "a fiduciary relationship with respect to property" formed by the settlor that "subjects the person holding title to the property"—the trustee—"to equitable duties to deal with the property for the benefit of another person"—the beneficiary. TEX. PROP. CODE § 111.004(4)(A). By contrast, a contract is a relationship formed when two or more people obligate themselves to one another through mutual promises. *See Campbellton Rd., Ltd. v. City of San Antonio*, 688 S.W.3d 105, 115 (Tex. 2024). The legal relationships formed by trusts and contracts have always been different in kind, and their corresponding bodies of law operate quite differently from one another.[4] *Accord Gibbons v. Anderson*, 575 S.W.3d 144, 149 (Ark. Ct. App. 2019) ("Since a trust agreement is not a contract, we cannot carte blanche apply contract . . . principles, statutes, or precedent to this dispute."). *See generally* AMY MORRIS HESS ET AL., BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 17 (July 2024 Update) [hereinafter BOGERT'S].

---

[4] *See, e.g.*, 4 AUSTIN WAKEMAN SCOTT ET AL., SCOTT AND ASCHER ON TRUSTS § 24.1.2, at 1657 (5th ed. 2007) [hereinafter SCOTT AND ASCHER] ("[N]either the courts of law nor the courts of equity regarded the creation of . . . a trust as contractual in any significant way."); Austin Wakeman Scott, *The Nature of the Rights of the* Cestui Que Trust, 17 COLUM. L. REV. 269, 269 (1917) ("The creation of a . . . trust has always been regarded as a legal transaction quite different from the creation of a contract."); FREDERICK POLLOCK, PRINCIPLES OF CONTRACT AT LAW AND IN EQUITY 221 (8th ed. 1908) ("[T]rusts are distinct in a marked way not merely from every other species of contract, but from all other contracts as a genus.").

No. 23-20318
c/w No. 23-20443

Relevant here, contracts and trusts do not form the same way. *See* 76 AM. JUR. 2D *Trusts* § 12 (Aug. 2024 Update). A contract arises if there is "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) a communication that each party consented to the terms of the contract; (5) execution and delivery of the contract with an intent it become mutual and binding on both parties; and (6) consideration." *Coleman v. Reich*, 417 S.W.3d 488, 491 (Tex. App.—Houston [14th Dist.] 2013, no pet.). By contrast, a trust is formed when the settlor, in writing,[5] identifies (1) a beneficiary, (2) the trust property (called the res), and (3) the trust's purpose. *See Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, N.A.*, 748 S.W.2d 218, 220 (Tex. 1988).

As its name suggests, the Trust Agreement creates a trust. Occidental is a beneficiary—§ 11.2(b) states, "Upon termination of the Trust, any assets remaining in the Trust shall be returned to [Occidental]." This language gives Occidental a remainder beneficial interest in the Trust res.[6] *See* TEX. PROP. CODE § 111.004(2) (defining beneficiary as "a person for whose benefit property is held in trust, regardless of the nature of the interest"); *id.* § 111.004(6) (defining interest as "any interest, whether legal or equitable or both, present or future, vested or contingent, defeasible or indefeasible"). The Trust Agreement also identifies the res—"cash or other property as [Occidental] deems appropriate." And the purpose of the legal arrangement formed by the Trust Agreement is clear—"to provide[] benefits" to specific

---

[5] This method is not the only way to create a trust. *See* TEX. PROP. CODE § 112.001.

[6] Occidental additionally possesses a discretionary beneficial interest under § 4.1—if the value of the Trust res reaches a specified level at the end of a calendar year, Occidental, upon request, may receive a disbursement from the Trust if Wells Fargo so chooses.

individuals and to defray the costs of doing so. Because a beneficiary, the res, and the purposes of the legal relationship are identified, the Trust Agreement creates a trust.[7] In that arrangement, Occidental is the settlor *and* a beneficiary, and Wells Fargo is the trustee.

In contrast, several elements necessary for contract formation are missing. For example, Occidental did not extend an offer to contract to Wells Fargo. The summary-judgment evidence shows only that the Trust Agreement was jointly executed by Occidental and Wells Fargo. There is no indication that Occidental extended an offer to contract, let alone to Wells Fargo. Trustees do not receive offers from settlors to serve as trustee—they are appointed to serve by settlors. *E.g.*, *Blieden v. Greenspan*, 751 S.W.2d 858, 859–60 (Tex. 1988) (per curiam); *see* Bogert's, *supra*, § 150 ("A conveyance and all the acts of the grantor thereunder are essentially unilateral. The grantor, of his own accord and without the aid of the grantee, accomplishes a transfer of his property interest."); *see also Rachal v. Reitz*, 347 S.W.3d 305, 311 (Tex. App.—Dallas 2011) ("The 'undertaking' between [settl]or and trustee 'does not stem from the premise of mutual assent to an exchange of promises' and 'is not properly characterized as contractual.' . . . [R]eferr[ing] to the Trusts interchangeably as 'agreements'

---

[7] A "rabbi trust" is still a trust. The "rabbi" aspect refers to the IRS's treatment of the trust for federal-tax purposes. *See Wycoff v. Comm'r*, T.C. Memo 2017-203, 2017 WL 4677657, at *4 n.8; David J. Cartano, Taxation of Compensation and Benefits ¶ 20.03[C], at 1475 (2023 ed.). But the way the IRS treats the trust does not bear on how the trust functions, which is determined by the Trust Agreement and Texas law. *See Chamberlain ex rel. Chamberlain v. United States*, 401 F.3d 335, 345 n.65 (5th Cir. 2005) ("'[S]tate law creates legal interests and rights,' while federal law 'designates what interests or rights, so created, shall be taxed.'" (original alterations omitted) (quoting *Morgan v. Comm'r*, 309 U.S. 78, 80 (1940))).

or 'contracts' does not change their basic nature.") (citation omitted)), *rev'd on other grounds*, 403 S.W.3d 840 (Tex. 2013).

Similarly, it is unclear what consideration Occidental and Wells Fargo exchanged when the Trust Agreement was executed. *See In re C.H.C.*, 396 S.W.3d 33, 45 (Tex. App.—Dallas 2013, no pet.) ("A lack of consideration occurs when a contract, *at its inception*, does not impose obligations on both parties." (emphasis added)). The terms of the Trust Agreement do not show that Occidental paid Wells Fargo for its trustee services—there is only a provision specifying who will pay out compensation that may be agreed to in the future. At best, the Trust Agreement reflects an agreement to agree on compensation for Wells Fargo's administration of the Trust, which is not valid consideration. *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("If an agreement to make a future agreement is not sufficiently definite as to all of the future agreement's essential and material terms, the agreement to agree 'is nugatory.'" (citation omitted)). Furthermore, "a marked distinction" between trusts and contracts is that trusts do not require consideration, while contracts remain "dependent on consideration for their enforceability." BOGERT'S, *supra*, § 17; *see* TEX. PROP. CODE § 112.003 ("Consideration is not required for the creation of a trust."); RESTATEMENT (SECOND) OF TRUSTS § 35 (AM. L. INST. 1959) ("A trust can be created without notice to or acceptance by the trustee."). So even if the Trust Agreement had specified the compensation Wells Fargo would receive for administering the Trust, that compensation would not qualify as consideration. *See Petrol. Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 832–33 (Tex. 1967) ("Consideration flowing to one who transfers property to another in trust is not essential to effectiveness or validity of the transfer.").

No. 23-20318
c/w No. 23-20443

The absence of any contract element means the Trust Agreement is not a valid contract.[8] In the absence of a valid contract, Occidental cannot, as a matter of law, succeed on its breach-of-contract claim. *See Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 415 (5th Cir. 2021) (applying Texas law) (identifying the existence of a valid contract as the first element of a claim for breach of contract).

2

Application of judicial estoppel turns Occidental's trust claim into a contract matter, even though the Trust Agreement demonstrates that neither party contemplated nor entered into a contractual arrangement with one another. *See* RESTATEMENT (SECOND) OF TRUSTS § 200 cmt. b ("The trustee . . . merely by accepting the trust and agreeing to perform his duties as trustee does not make a contract with the settlor to perform the trust which the settlor could enforce."); *id.* § 197 cmt. b ("A trustee who fails to perform his duties as trustee is not liable to [a] beneficiary for breach of contract . . . . The creation of a trust is conceived of as a conveyance of the beneficial interest in the trust property rather than as a contract."); 4 SCOTT AND ASCHER, *supra*, § 24.1.2, at 1658 ("[A] trustee is not liable in an action for breach of contract unless the trustee has undertaken to do something other than merely to administer the trust. The fact that the trustee has expressly agreed to administer the trust is an insufficient basis to justify an action for breach of contract if the trustee commits a breach of trust."). The most

---

[8] Even if one or more contract elements were satisfied, the intent behind the present legal arrangement would still indicate its nature as a trust. *See* Scott, *supra*, 17 COLUM. L. REV. at 270 ("[I]n spite of the fact that in the creation of a . . . trust there are often found all the elements which are found in the creation of a contract, nevertheless an action at law for breach of contract will not lie against one who holds subject to a . . . trust.").

peculiar effect of doing so is Occidental will have secured a multimillion-dollar judgment when its claim to those damages has not ripened.

As discussed, Occidental may receive disbursements from the Trust in two situations: when (i) all individuals to be paid out from the res have been paid and assets remain after any administrative expenses are settled, and (ii) excess funds remain at the end of a calendar year and Wells Fargo elects, at Occidental's request, to distribute those funds. Outside of these options, Occidental has no present claim to the assets in the Trust res or any authority to direct Wells Fargo as to its management of the same.[9] *See* BOGERT'S, *supra*, § 42 ("After a settlor has completed the creation of a trust," the settlor, "except as expressly provided otherwise by the trust instrument or by statute, . . . has no rights, liabilities or powers with regard to the trust administration."). Once the mandate issues, Occidental will hold a multimillion-dollar judgment as to assets with which it *irrevocably* parted, and may well never have had title to again. Given the assets at issue, there is certainly a possibility that when the Trust terminates, Occidental may not receive any assets or will receive a smaller quantum of assets as a result of

---

[9] As the settlor of a rabbi trust, Occidental does not "own" the Trust assets in the ordinary sense of the word. *See Own*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("To rightfully have or possess as property; to have legal title to."). Occidental has no legal title to the Trust assets—under the arrangement created by the Trust Agreement, the IRS treats the Trust assets as though Occidental owns them. *See* Ethan Yale & Gregg D. Polsky, *Reforming the Taxation of Deferred Compensation*, 85 N.C. L. REV. 571, 576 n.16 (2007) ("Trusts that qualify as rabbi trusts are effectively disregarded for federal tax purposes, as their income is reported by the employer."). Occidental "owns" the Trust assets for federal-tax purposes but does not possess or exercise dominion over them.

No. 23-20318
c/w No. 23-20443

Wells Fargo's pre-suit actions. But whether that is the correct result should be considered when the Trust terminates, not before.[10]

Applying judicial estoppel here imposes a legal relationship on the parties that they did not contemplate or agree to. This result is inequitable, and judicial estoppel is not warranted.

D

As applied to Wells Fargo, judicial estoppel effectively operates as a harsh sanction—Wells Fargo essentially faces entry of judgment for its inconsistent statements. *See Klein*, 185 F.3d at 110 (describing judicial estoppel as "often the harshest remedy").

Judicial estoppel's purpose is "'to protect the integrity of the judicial process'[] by 'preventing parties from playing fast and loose with the courts to suit the exigencies of self interest.'" *Coastal Plains*, 179 F.3d at 205 (original alterations omitted) (quoting *Brandon v. Interfirst Corp.*, 858 F.2d

---

[10] Under the rule of orderliness, it is no doubt permissible to apply judicial estoppel to inconsistent assertions of law. *See Republic of Ecuador*, 708 F.3d at 657. Importantly, though, given the "very complicated issues" that "arise when judicial estoppel is purported to apply to pure issues of law," *Thore v. Howe*, 466 F.3d 173, 182 n.3 (1st Cir. 2006), courts generally appear reluctant to apply the doctrine to pure legal issues, and some of our sister circuits have gone so far as to categorically refuse to apply judicial estoppel in such situations, *e.g.*, *BancInsure, Inc. v. FDIC*, 796 F.3d 1226, 1240 (10th Cir. 2015). *See* Rand G. Boyers, Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel*, 80 Nw. U.L. Rev. 1244, 1262 (1986) ("Expressions of legal conclusions are not part of the doctrine because 'historically, switching one's legal grounds in a suit has never been regarded with the same disfavor as maintaining inconsistent positions as to the facts.'" (citation omitted)); Kira A. Davis, Note, *Judicial Estoppel and Inconsistent Positions of Law Applied to Fact and Pure Law*, 89 Cornell L. Rev. 191, 230 (2003) ("For inconsistent positions of pure law, . . . judicial estoppel will rarely be appropriate. The costs imposed on litigants and courts alike are high, and are not justified by those few cases in which estoppel could be applied without undue harm."). In fact, this case appears to be the first instance in which this Court has applied judicial estoppel to inconsistent assertions of law made solely within the same proceeding.

266, 268 (5th Cir. 1988)). The doctrine's sole concern is protecting the courts. Yet as considered above, the effects of Wells Fargo's inconsistent statements are reversible—and if judicial estoppel is applied, Wells Fargo will not prevail, even though it never received the unfair advantage characteristic of the doctrine.

We are not faced with a strictly binary choice of either (1) resolving this claim on judicial-estoppel grounds, or (2) allowing Wells Fargo to make inconsistent statements with impunity. *See Klein*, 185 F.3d at 110 ("The [district court] in this case evidently thought [itself] confronted by an all-or-nothing choice: dealing with what [it] saw as bad faith through the invocation of judicial estoppel, or ignoring that bad faith. In electing to invoke judicial estoppel, the [district judge] foreclosed a plaintiff with a potentially meritorious claim from presenting her case in court."). Courts possess precise tools to regulate litigant conduct, *see, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991), which may be utilized harmoniously while also effectuating this Court's strong policy favoring "resol[ution] [of] cases on their merits," *see In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 594 (5th Cir. 2014). To fulfill judicial estoppel's aim of "achiev[ing] substantial justice," *Reed*, 650 F.3d at 576, it is best to consider whether a less severe option may address Wells Fargo's inconsistent assertions while allowing this case to be resolved on the merits. *See Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 993 (10th Cir. 2014) ("[J]udicial estoppel is a powerful weapon to employ against a party seeking to vindicate its rights, and there are often lesser weapons that can keep alleged inconsistent statements in check while preserving a party's option to have its day in court."); *cf. Krim v. First City Bancorporation of Tex. Inc. (In re First City Bancorporation of Tex. Inc.)*, 282 F.3d 864, 867 (5th Cir. 2002) (per curiam) ("Sanctions must be chosen to employ 'the least possible power to the end proposed.' In other words, the sanctioning court must use the least

restrictive sanction necessary to deter the inappropriate behavior." (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990))).

"[J]udicial estoppel is an 'extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice.'" *Ryan Operations*, 81 F.3d at 365 (citation omitted); *USLIFE Corp. v. U.S. Life Ins. Co.*, 560 F. Supp. 1302, 1306 (N.D. Tex. 1983) (Hill, J.) ("To estop a party from urging a position is an extreme measure which should only be taken where the equities are clearly in its favor."). The equities do not weigh in favor of applying judicial estoppel.

IV

For these reasons, I respectfully dissent from the application of judicial estoppel to affirm the district court's grant of summary judgment to Occidental on liability and award of damages on the claim for breach of contract regarding the Trust Agreement. I concur in the remainder of the panel opinion. Accordingly, I would vacate the district court's summary-judgment orders as to the Trust Agreement-related breach-of-contract claim, affirm on the remaining grounds, and remand for further proceedings.